RANDY P. DAVENPORT, ESQ.,(RD-7060)
Attorney-At-Law
50 Park Place, Suite 825
Newark, New Jersey 07102
(973) 623-5551 * Fax (973) 623-6868
Attorney for Plaintiff, Kevin Francis
rpdavenport@aol.com

| | |
|---|---|
| KEVIN FRANCIS, through his guardian ad litem, Tamika Francis, | :UNITED STATES DISTRICT COURT :DISTRICT OF NEW JERSEY : : |
| | :Honorable Faith S. Hochberg, |
| Plaintiff(s) | :J.U.S.D.C. : |
| v. | :Civ. Action No: 09-3449(FSH) : : |
| CITY OF NEWARK, ANTONIO TAVARES, individually and in his official capacity, ANTHONY MATOS individually and in his official capacity, ADOLPH VAZQUEZ, individually and in his official capacity, DARRIN MARASCO, individually and in his official capacity, JOHN DOES, 1 through 10, individually and in their official capacity and ROBERT DOES, 1 through 10, individually and in their official capacity. | : : : : : : : : : : : : : |
| Defendant(s) | : : |

## BRIEF IN OPPOSITION TO DEFENDANTS' CITY OF NEWARK AND DARRIN MARASCO'S MOTION FOR SUMMARY JUDGMENT

RANDY P. DAVENPORT, ESQ.
Attorney-At-Law
Robert Treat Center
50 Park Place, Suite 825
Newark, New Jersey 07102
Tel. (973) 623-5551
Fax (973) 623-6868

## PLAINTIFF'S RESPONSIVE STATEMENT OF MATERIAL FACTS

1.   Agree

2.   Disagree

3.   Agree

4.   Agree

5.   Disagree.   Plaintiff agrees that the tee-shirt Plaintiff was wearing was provided to Defendant Marasco for DNA analysis to determine if urine or its by products were on the tee-shirt. However, Plaintiff has no way of knowing if the tee-shirt he provided was presented for DNA analysis.

6.   Agree

7.   Agree

8.   Agree

9.   Agree

10.  Disagree

11.  Agree

12.  Agree

13.  Agree

## SUPPLEMENTAL STATEMENT OF DISPUTED FACTS

1.   Plaintiff is African-American and was 13 years of age on the date of the incident.

2.   Plaintiff was grabbed by his arm and put in the patrol vehicle by Officers Matos and Tavares.   Plaintiff's deposition transcript at page 40 lines 1 through 9. [1]  He was driven around.   During the drive the officers tried to

---

[1] Plaintiff Kevin Francis' deposition transcript is attached to the Declaration of Avion Benjamin in Support of Defendants' Motion for Summary Judgment.

make Plaintiff admit to a crime that he did not commit by telling him that if he did not they were going to take him to the park and beat him up.    Plaintiff's deposition transcript at page 38 lines 1 through 18.

3.    The officers scared Plaintiff so bad that he falsely admitted to trying to steal a car.    Plaintiff's deposition transcript at page 37 lines 1 through 38 to page 38 line 18; page 40 lines 14 through 23.

4.    While driving Plaintiff around the officers told Plaintiff they were going to throw him off of a bridge.    Plaintiff was scared and told the officers he did not know how to swim.    Plaintiff's deposition transcript at page 41 lines 17 through 22.

5.    The officer took Plaintiff to a desolate area and told him to urinate on himself.    Plaintiff's deposition transcript at page 45 lines 7 through 22.

6.    When Plaintiff refused to urinate on himself, the officers started assaulted him with their hands and a night stick. Plaintiff's deposition transcript at page 45 line 21 through page 46 line 12.

7.   After the officers physically assaulted Plaintiff by holding, punching and hitting him, Plaintiff fell to the ground.   Plaintiff's deposition transcript at page 47 lines 2 through 14.

8.   While lying on his stomach, Plaintiff heard an officer unzip his pants.   Plaintiff's deposition transcript at page 48 lines 15 through page 49 line 8.

9.   The officers then urinated on Plaintiff.   Plaintiff could feel and smell the urine as he lay there.   Plaintiff's deposition transcript at page 47 lines 20 through 21; page 48 lines 12 through 19.

10.  Plaintiff testified that the Officer urinated on Plaintiff's neck "and stuff."   Plaintiff's deposition transcript at page 48 lines 7 through 9.

11.  Officer Marasco did not take care to itemize the brand name of the tee-shirt that Plaintiff provided to him for DNA analysis.   Defendant Marasco's deposition transcript at page 35 line 24 through page 37 line 16. [2]

12.  Plaintiff submits that there is no way of knowing if the tee-shirt that the Officer Marasco provided is even the tee-shirt that Plaintiff gave to Officer Marasco.

---

[2] The deposition transcript of Darrin Marasco is attached as Exhibit C to the Declaration of Randy P. Davenport, Esq., in opposition to Defendants' Motion for Summary Judgment.

13. Defendant Marasco previously served as Defendant Anthony
Matos' supervisor. In spite of this prior relationship
with Matos, Marasco still conducted the internal affairs
investigation into this matter rather than have it
reassigned to an independent officer. Defendant Marasco's
deposition transcript at page 59 lines 13 through 24.

14. Plaintiff's attorney requested that the tee-shirt be
returned to him by certified letter/return receipt
requested dated April 11, 2008. See Exhibit A to
Declaration of Randy P. Davenport, Esq., in opposition to
Defendant's Motion for Summary Judgment.

15. Although Defendant Marasco claimed he assumed Plaintiff's
attorney picked up the tee-shirt, Marasco had no
independent recollection of the tee-shirt being picked up
and no signed receipt indicating that the tee-shirt was
picked up. Deposition transcript of Defendant Darrin
Marasco at page 14 lines 21 through 23; page 16 lines 16
through page 17 line 16.

16. The tee-shirt was never returned to Plaintiff's attorney.
Deposition transcript of Defendant Darrin Marasco at page
16 line 9 through 15.

17. Darrin Marasco claims to not know what happened to the tee-shirt. Deposition transcript of Defendant Darrin Marasco at page 14 lines 7 through 8.

18. Darrin Marasco indicated that under the circumstances involved in this case, it would have been no reason for the officers to employ physical force against the Plaintiff. Deposition transcript of Defendant Darrin Marasco at page 49 lines 23 through page 50 line 7.

19. Darrin Marasco indicated that under no circumstances would it have been appropriate for the officer to urinate on Plaintiff. Deposition transcript of Defendant Darrin Marasco at page 50 lines 8 through 15.

## LEGAL ARGUMENT

### POINT I

**THE COURT MUST DENY DEFENDANT'S MOTION FOR SUMMARY JUDGMENT BECAUSE THE QUALIFIED IMMUNITY PROVISION OF THE NEW JERSEY TORT CLAIMS ACT ARE IN APPLICABLE TO THIS MATTER INASMUCH AS THE DEFENDANTS ENGAGED IN ACTS OF ACTUAL MALIC, WILLFULL MISCONDUCT AND/OR RECKLESSNESS.**

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)* (quoting *Fed.R.Civ.P. 56(c)*). In deciding a motion for summary judgment, the Court must construe the facts and inferences in a light most favorable to the non-moving party. *Pollock v. Am. Tel. & Tel. Long Lines, 794 F.2d 860, 864 (3d Cir.1986)*.

Plaintiffs are generally barred under the New Jersey Tort Claims Act (TCA), from receiving damages for injury against public entities or public employees unless there is a "permanent loss of a bodily function permanent injury disfigurement or dismemberment where the medical treatment expenses are in excess of $3,600.00". See N.J.S.A.59:9-2(d). It is equally clear, however, that the immunity provision of N.J.S.A.59:9-2(d) are inapplicable "if it is established that the conduct was outside

6

the scope of his employment or constituted…actual fraud, actual malice or willful misconduct."

Immunity extends to public employees who "act[] in good faith in the execution or enforcement of any law." N.J.S.A.59-3-3. It has been noted that in order to receive the immunity protections of the TCA, public employees must "establish that their acts were objectively reasonably or that they performed them with subjective good faith." Canico v. Hurtado,144 NJ 361, 365 (1996).

While Defendant City of Newark asserts that Plaintiff has not satisfied the verbal threshold requirements of the TCA, the New Jersey Supreme has explained that defendants who engage in reckless conduct can not avail themselves to qualified immunity based upon the verbal threshold. See Leang v. Jersey City Board of Education, 198 N.J. 557 (2009). The Leang Court explained that:

> We begin our analysis with an examination of the TCA provisions that strip away immunity for acts of willful misconduct. As we have held, "[b]y its plain, unambiguous, and specific terms, *N.J.S.A. 59:3-14*(a) [the actual fraud, actual malice or willful misconduct provision] creates an exception to the verbal threshold," *Toto v. Ensuar*, 196 *N.J.* 134, 145, 952 *A.2d 463 (2008); see also Velez v. City of Jersey City*, 180 *N.J.* 284, 291, 850 A.2d 1238 (2004) (explaining that "[i]t is the intent of [*N.J.S.A. 59:3-14*(a)] that a public employee guilty of outrageous conduct cannot avail himself of the limitations as to liability and damages contained in [the TCA]" (citation omitted)).

[8][9] The traditional formulation of willful misconduct has required "a showing that there has been a deliberate act or omission with knowledge of a high degree of probability of harm and reckless indifference to consequences." *Berg v. Reaction Motors Div., Thiokol Chem. Corp.*, 37 *N.J.* 396, 414, 181 *A.*2d 487 (1962). In some contexts, we have described it as conduct that falls "between simple negligence and the intentional infliction of harm," *Fielder v. Stonack*, 141 *N.J.* 101, 123, 661 *A.*2d 231 (1995) (citation omitted), cautioning that "there must be some knowledge that the act is wrongful," *id.* at 124, 661 A.2d 231.

[*Leang*, *supra*, at 583-584]. The *Leang* Court further explained that the TCA, by its own terms, excludes false arrest and false imprisonment claiming entirely from its grant of immunity. *Leang* at 582. The *Leang* court also stated:

Moreover, the TCA specifically provides that there will be no immunity for a public employee if the conduct complained of constituted actual fraud, actual malice, or willful misconduct. *N.J.S.A.* 59:3-14(a) ("Nothing in this act shall exonerate a public employee from liability if it is established that his conduct was outside the scope of his employment or constituted ... actual fraud, actual malice or willful misconduct.").

[*Leang*, *supra*, at 582-83].

When applying the above-referenced principles to the instant matter it becomes patently obvious that summary judgment is inappropriate. Plaintiff, who was thirteen years old at the

8

time of the incident, contends that he was walking in the city
of Newark and was picked up by officers Antonio Tavares and
Anthony Matos and put into their patrol vehicle.  He was driven
around in a patrol car by the officers.  He was taken out of the
patrol vehicle, whereupon he was physically assaulted and
urinated on by officers Matos and Tavares.  He then was left in
a desolate area near the Essex County Jail.  The officers also
tried to make Plaintiff admit to crimes he did not commit and
threatened to throw Plaintiff of a bridge.

If Plaintiff's version of the facts is believed, under no
circumstances can it be found that the officers where acting
objectively reasonable or that their acts were performed with
subjective good faith.  The officers' conduct without doubt
falls into the categories of actual malice, willful misconduct
or recklessness, classifications for which there is no qualified
immunity.  See N.J.S.A. 59:3-14a.

Certainly there is a genuine issue of material fact as the
Plaintiff contends that he was threatened, assaulted, illegally
detained and urinated on by the officers.  The Officers, on the
other hand, contend that they committed no such acts.
Accordingly, Summary Judgment should be denied with respect to
Plaintiff's state tort causes of action for intentional
infliction of emotional distress and assault and battery,
inasmuch as they constitute acts of actual malice, willful
misconduct and/or recklessness.  Moreover, the New Jersey
Supreme Court in Canico, supra, has explained that claims for

false arrest/imprisonment are not barred by the immunity provisions of the TCA.

## POINT II

**DEFENDANT DARRIN MARASCO'S MOTION FOR SUMMARY JUDGMENT SHOULD BE DENIED INASMUCH AS THERE IS A GENUINE ISSUE OF MATERIAL FACT AS TO WHETHER PLAINTIFF HAS ESTABLISHED A CIVIL CONSPIRACY.**

The Court must deny Defendant Marasco's Motion for Summary Judgment because Plaintiff has established a genuine issue of material fact as to whether Defendant Marasco engaged in a civil conspiracy.

In order to prevail in a § 1985 conspiracy case Plaintiff must show that the defendants were "motivated by a class-based invidiously discriminatory animus," and that defendants "conspired to deprive Plaintiff of the equal protection rights of the laws or of equal privileges and immunities under the laws." Pomykacz v. Borough of West Wildwood, 438 F. Supp. 2d 504, 513 (D.N.J. 2006) citing Bougher v. University of Pittsburgh, 882 F.2d 74, 79 (3d Cir. 1989); see also Farber v. City of Paterson, 440 F.3d 131, 135 (3d Cir. 2006); Griffin v. Breckinridge, 403 U.S. 88,102, 91 S. Ct. 1790, 29 L. Ed. 2d 338 (A71).

Plaintiff, an African-American male, has established the elements necessary to proceed with his civil conspiracy claim against Defendant Darrin Marasco. Officer Marasco admitted that he was defendant Matos' sergeant when Matos was a patrolman.

10

Defendant Marasco's deposition transcript at page 59 lines 13 through 24. Hence the two had a previous relationship which formed a basis for Matos and Marasco to engage in a conspiracy to destroy the tee-shirt. Additionally, in spite of their prior working relationship, Marasco opted to lead the Internal Affairs Investigation into this matter rather then to have the case re-assigned. The tee-shirt was provided to Marasco to have DNA analysis conducted. It is unknown whether the tee-shirt that was provided to Marasco was the shirt that was submitted to the State laboratory for testing. Plaintiff maintains that Marasco may have switched tee-shirts and not given the proper tee-shirt to the State lab. In any event, Plaintiff was deprived of the opportunity to have the tee-shirt tested by his own expert. The laboratory report itself indicates that the specimen was not processed for trace evidence and that the lab should be contacted regarding the necessity for any trace evidence analysis. See Exhibit B to Declaration of Randy P. Davenport, Esq., in Opposition to Defendant's Motion for Summary Judgment. Defendant Marasco never requested that trace analysis be performed and by destroying the tee-shirt, he prevented Plaintiff from doing so.

Under the above scenario, Plaintiff has established a material issue of genuine fact warranting denial of Defendant Marasco's Motion for Summary Judgment. This is clearly so inasmuch as Summary Judgment is frowned upon in conspiracy cases. See Paton v. LaPrade, 471 F. Supp. 166, 171 (DNJ 1979)

11

citing <u>Adickes v. S.H. Kress & Co.</u>398 US 144, 176 1970 (Justice Black, concurring).


## **CONCLUSION**

For the foregoing, Defendants' Motion for Summary Judgment dismissing Plaintiff's state causes of actions and civil conspiracy claims should be denied.


Respectfully submitted,


RANDY P. DAVENPORT      /S/
RANDY P. DAVENPORT, ESQ.

RANDY P. DAVENPORT, ESQ.(RD-7060)
Attorney-At-Law
50 Park Place, Suite 825
Newark, New Jersey 07102
(973) 623-5551 * Fax (973) 623-6868
Attorney for Plaintiff, Kevin Francis
rpdavenport@aol.com

| | |
|---|---|
| KEVIN FRANCIS, through his guardian ad litem, Tamika Francis, | :UNITED STATES DISTRICT COURT<br>:DISTRICT OF NEW JERSEY<br>:<br>:<br>:Honorable Faith S. Hochberg, |
| Plaintiff(s)<br>v. | :J.U.S.D.C.<br>:Civ. Action No: 09-3449(FSH)<br>:<br>: |
| CITY OF NEWARK, ANTONIO TAVARES, individually and in his official capacity, ANTHONY MATOS individually and in his official capacity,<br>ADOLPH VAZQUEZ, individually and in his official capacity, DARRIN MARASCO, individually and in his official capacity, JOHN DOES, 1 through 10, individually and in their official capacity and ROBERT DOES, 1 through 10, individually and in their official capacity. | :<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>: |
| Defendant(s) | :<br>: |

**DECLARATION OF RANDY P. DAVENPORT, ESQ., IN OPPOSITION TO DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT**

RANDY P. DAVENPORT, ESQ.
Attorney-At-Law
Robert Treat Center
50 Park Place, Suite 825
Newark, New Jersey 07102
Tel. (973) 623-5551
Fax (973) 623-6868

I, Randy P. Davenport, Esq., under penalty, declare as follows:

1.     I am an attorney licensed to practice law in the State of New Jersey and in the District Court of New Jersey.

2.     I represent Plaintiff in the captioned matter.

3.     I am familiar with the facts of this action and make this Declaration in Opposition to Defendants' Motion for Summary Judgment pursuant to Fed. R.Civ.P.56.

4.     Attached hereto as Exhibit A is a true, accurate, and complete copy of a letter dated April 11, 2008 from Randy P. Davenport, Esq., to the attention of Lt. Darrin Marasco of the Newark Police Department.

5.     Attached hereto as Exhibit B is a true, accurate, and complete copy of a lab report dated November 5, 2007.

6.     Attached hereto as Exhibit C is a true, accurate, and complete copy of the deposition transcript of Lt. Darrin Marasco dated August 11, 2010.

7.     I hereby declare and affirm that to the best of my knowledge the foregoing statements are true. I am aware, that if any of the foregoing statements are knowingly false, I am subject to punishment. Executed under penalty of perjury this 22nd day of November 2010.


                              Respectfully submitted,


                              RANDY P. DAVENPORT    /S/
                              RANDY P. DAVENPORT, ESQ.

# EXHIBIT A

 

# RANDY P. DAVENPORT, ESQ.

Attorney-At-Law
Robert Treat Center
50 Park Place, Suite 1400
Newark, New Jersey 07102
Tel. (973) 623-5551 Fax (973) 623-6868

Randy P. Davenport

April 11, 2008

**Via Certified Mail/RRR**
Office of Internal Affairs
Newark Police Department
22 Franklin Street
Newark, New Jersey 07102
Attn: Lieutenant Darrin Marasco

**RE:   Investigation of Personnel # 2007-613**

Dear Lt. Marasco:

As you know, I represent the interests of Kevin Frances with regard to the above-referenced matter. I am in receipt of your correspondence dated January 23, 2008 addressed to my client Kevin Frances. Kindly return to the undersigned the clothing that was provided for DNA analysis.

I thank you for your prompt attention in this matter.

Very truly yours,

RANDY P. DAVENPORT, ESQ

RPD/vat



# EXHIBIT B

## NEW JERSEY STATE POLICE
## OFFICE OF FORENSIC SCIENCES

## CRIMINALISTICS LABORATORY REPORT

| Central Regional Laboratory | Laboratory No. E07-03781 |
| --- | --- |
| Submitting Agency Newark PD – Sexual Assault Unit | Agency No. 07-62014 |

| Case: Kevin Francis (V) | | |
| --- | --- | --- |
| Unknown Unknown (S) | Found Item | Date of Report 11/05/07 |

Evidence in this case was submitted to the Office of Forensic Sciences for examination.
See attached *Evidence Receipt* for list of items.

**Results of Forensic Serology Examinations:**                                    Page 1 of 2

No metabolic waste products excreted in urine were detected in the stain(s) on specimen 1.

This case was not processed for trace evidence.  Please contact the laboratory regarding the necessity for any trace evidence analysis.

**Cortney MacDonald**
**Forensic Scientist I**



# NEW JERSEY STATE POLICE
## OFFICE OF FORENSIC SCIENCES

## CRIMINALISTICS LABORATORY REPORT

| | |
|---|---|
| **Central Regional Laboratory** | **Laboratory No.** E07-03781 |
| **Submitting Agency** Newark PD – Sexual Assault Unit | **Agency No.** 07-62014 |

**Case:** Kevin Francis (V)
Unknown Unknown (S) — Found Item

**Date of Report** 11/05/07

Evidence in this case was submitted to the Office of Forensic Sciences for examination. See attached *Evidence Receipt* for list of items.

### Results of Forensic Serology Examinations:

Page 2 of 2

| Item | Not Examined | Presumptive Test For Semen | Spermatozoa | p30 (A constituent of semen) | Amylase (A constituent of saliva) | Presumptive Test For Blood | Human Origin | Comments |
|---|---|---|---|---|---|---|---|---|
| 1. Shirt (V) | | ND | | | | | | See page 1. |
| | | | | | | | | |

| | |
|---|---|
| +/- | Positive / Negative |
| NE | Not Examined |
| NEV | Nothing of Evidential Value |
| NFE | No Further Examination |
| INC | Inconclusive |
| QNS | Quantity of stain insufficient for analysis |
| ND | Not Detected |

**Analyst:**

*Cortney MacDonald*
**Cortney MacDonald**
**Forensic Scientist I**

# EXHIBIT C

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CIVIL ACTION NO. 09-3449 (FSH)

KEVIN FRANCIS, through
his guardian ad litem,
TAMIKA FRANCIS,

    Plaintiffs,

      -v-

CITY OF NEWARK, ANTONIO
TAVARES, individually and
in his official capacity,
ANTHONY MATOS, individually
and in his official capacity,
ADOLPH VAZQUEZ, individually
and in his official capacity,
DARRIN MARASCO, individually
and in his official capacity,
JOHN DOES 1 through 10,
individually and in their
official capacity, ROBERT
DOES 1 through 10,
individually and in their
official capacity,

    Defendants.

DEPOSITION UPON
ORAL EXAMINATION
      OF
LT. DARRIN MARASCO



       TRANSCRIPT of the deposition of the
above-named witness, called for Oral Examination in the
above-entitled matter, said deposition being taken by
and before STEPHANIE LYN RAHN, a Certified Shorthand
Reporter, License No. XIO1717, and Notary Public
of the State of New Jersey, at the CITY HALL, 920 Broad
Street, Newark, New Jersey, 07102 on Wednesday, August
11, 2010, commencing at 10:00 in the forenoon.

DepoLink
Court Reporting & Litigation Support Services
Phone (973) 353-9880   Fax (973) 353-9445
www.depolinklegal.com

## Page 2

1
2
3  A P P E A R A N C E S:
4
5  CITY HALL
   Department of Law
   920 Broad Street, Room 316
6  Newark, New Jersey 07102
   BY: AVION BENJAMIN, ESQ.
7  Attorney for Defendants City of Newark
   and Lt. Darrin Marasco
8
   RICCI FAVA, LLC
9  300 Lackawanna Avenue, Suite 5
   West Paterson, New Jersey 07424
10 BY: BROOKE BAGLEY, ESQ.
   Attorney for Defendant Officer Anthony Matos
11
   RANDY P. DAVENPORT, ESQ.
12 The Robert Treat Center
   50 Park Place, Suite 825
13 Newark, NJ 07102
   Attorney for Plaintiffs
14
15
16
17
18
19
20
21
22
23
24
25

## Page 3

1
      I N D E X
2
3  WITNESS      DIRECT CROSS REDIRECT RECROSS
4
   LT. DARRIN MARASCO
5
6  BY: MR. DAVENPORT    4        63
7  BY: MS. BENJAMIN     62
8
9
10
      E X H I B I T S
11
   NUMBER    DESCRIPTION       PAGE
12
   P-1    Letter dated April 11, 2008    18
13
   P-2    Report dated January 3, 2008   23
14
   P-3    Report dated January 3, 2008   26
15
   P-4    Lab Report, two pages    32
16
   P-5    Property Form dated
17        July 24, 2007       36
18 P-6    Letter dated January 3, 2008   39
19 P-7    Motor Patrol Log     40
20 P-8    Tour Assignment Report    44
21 P-9    Event Chronology     45
22 P-10   Memorandum dated June 19, 2003 53
23 P-11   Letter dated December 4, 2007  56
24 P-12   Evidence Receipt dated
          July 24, 2007       57
25

## Page 4

1
2
3       LIEUTENANT DARRIN MARASCO,
4  doing business at 22 Frankin Street, Newark, New Jersey,
5  having been duly sworn by the Notary, testified as
6  follows:
7
8  DIRECT EXAMINATION BY MR. DAVENPORT:
9
10     Q     Good morning. What is your
11 rank?
12     A     Lieutenant.
13     Q     Good morning, Lieutenant. I am
14 Randy Davenport. I represent the plaintiff in
15 this matter Kevin Francis. I will start out by
16 giving you some very brief instructions.
17         You know you are here to have
18 your deposition taken. I presume you know you
19 have been named as a defendant in this case. The
20 purpose of today's proceedings is just to ask you
21 questions and find out what you know about this
22 case.
23         The primary area of questions
24 for you will be the T-shirt, basically what
25 happened to the T-shirt and what did you do, what

## Page 5

1  was your role with regard to the T-shirt and what
2  were your expectations with regard to the
3  T-shirt, and there will be some other questions
4  as well.
5         There is nothing here designed
6  to trick you, fool you or anything to that
7  effect, I am merely trying to find out what
8  happened. I would ask during the course of these
9  proceedings, you allow me to ask my full question
10 before you begin to answer the question, and
11 likewise, I will try to let you get your answers
12 out before I proceed with another question. As
13 you know, we have a court reporter here, she's
14 taking everything down, and she can't take us
15 down effectively if we are speaking at the same
16 time. Okay?
17     A     Yes.
18     Q     Do you have any -- and if there
19 are any objections posed, by your counsel or the
20 other counsel, your counsel will instruct you
21 whether to answer the questions or not. If she
22 does object, don't answer the question, let Ms.
23 Benjamin say what she has to say on the record
24 and you will be directed whether or not to answer
25 the question. Alright?

Page 6

1    A    Yes.
2    Q    Alright, so you know this case
3  is concerning the investigation of Kevin Francis.
4  Correct?
5    A    Yes.
6    Q    Now, before we get to that, I
7  just want some background information on you
8  concerning your tenure as a law enforcement
9  officer. Can you begin by giving me an
10 indication of when you first went to the police
11 academy. I assume you did, and basically what
12 has been the course of your employment from that
13 time, how long you have been on the force and
14 things of that nature.
15   A    I am in my 16th year of service
16 of the Newark Police Department. I started in
17 February of 1995 in the police academy, graduated
18 in July of the same year. I was assigned various
19 patrol duties.
20   Q    What year was that?
21   A    1995 I started. First promotion
22 was in 2000, rank of sergeant, second promotion
23 was 2005 to the rank of lieutenant. As far as
24 method of service, it's been patrol, motorcycle,
25 internal affairs, criminal investigation

Page 7

1  division, pretty much everybody.
2    Q    Where are you now?
3    A    Criminal Investigations Bureau.
4    Q    What does that involve, Criminal
5  Investigations Bureau?
6    A    The investigative functions of
7  the police department, department-wide, all the
8  detectives.
9    Q    You are a lieutenant now still?
10   A    Yes.
11   Q    And you supervise detectives, is
12 that what you do?
13   A    No, actually I am administrative
14 now, I work for Chief of Detectives Headquarters.
15   Q    You indicated in 1995 you
16 started and at that time I guess you were patrol,
17 patrolman?
18   A    Police officer once you graduate
19 the academy.
20   Q    And you were in that rank until
21 2000 when you became a sergeant?
22   A    Correct.
23   Q    When you became a sergeant, what
24 unit were you employed in?
25   A    Patrol.

Page 8

1    Q    The entire time?
2    A    Motorcycle and Internal Affairs.
3    Q    So you were a sergeant in
4  Internal Affairs for awhile?
5    A    Yes.
6    Q    When did you become a sergeant
7  in Internal Affairs?
8    A    Around 2002 I think, 2004,
9  between that time, just a year.
10   Q    What happened after that, after
11 that year, did you stay in Internal Affairs that
12 entire time, from 2002 until you left?
13   A    No, it was a year tour. It was
14 2004 I left when I got promoted to lieutenant in
15 2005, and then I was assigned I believe to the
16 Fifth Precinct in patrol. No, no, Safe City Task
17 Force.
18   Q    And ultimately you ended up back
19 in Internal Affairs?
20   A    Yes.
21   Q    When did that take place?
22   A    I think it was 2006.
23   Q    2006. When you went to Internal
24 Affairs in 2006, what position did you go in as?
25   A    Investigator.

Page 9

1    Q    Now, you indicated you were a
2  sergeant in Internal Affairs prior to that?
3    A    Yes.
4    Q    Okay. And that was in 2000 and
5  what?
6    A    I believe it was '04 and '05.
7    Q    So not '02, 2000 --
8    A    No, I think it was '04.
9    Q    I am not too familiar with the
10 set up of Internal Affairs. So if you could tell
11 me, you said you were a sergeant in Internal
12 Affairs in 2004 for a year or so. Then in 2006
13 you went back as an investigator?
14   A    Sent back, yes.
15   Q    Sent back as an investigator.
16 Which rank would be higher, the sergeant or the
17 investigator?
18   A    I was -- investigator, I was a
19 Lieutenant Investigator or Sergeant Investigator,
20 one in the same.
21   Q    When you went back in 2006, you
22 were a Lieutenant Investigator?
23   A    I was a lieutenant. My function
24 was Internal Affairs Investigator.
25   Q    Now, I want to direct your

Page 10

1  attention more closely to the incident that we
2  are here for now. At a certain point in time you
3  became involved in the investigation concerning
4  Kevin Francis. Correct?
5      A    Yes.
6      Q    Can you indicate how it is you
7  became involved in that matter?
8      A    Most likely I was just assigned
9  to the assignment when it came in by the
10 executive officer.
11     Q    Do you know how were you were
12 assigned?
13     A    It was a preliminary
14 investigation so most likely it would have been
15 verbally.
16     Q    Do you know where the initial
17 information came from that there was an incident
18 involved in which Kevin Francis --
19     A    The best I can recall, it was
20 referred as a walk-in.
21     Q    Walk-in by who?
22     A    The complainant.
23     Q    To the best you recall, you are
24 not sure?
25     A    I am not 100 percent. I

Page 11

1  remember doing a preliminary investigation.
2  Usually in a preliminary investigation the
3  complainant is there.
4      Q    Do you have a file concerning
5  this matter?
6      A    Yes, there was a report filed.
7      Q    I am going to ask, Ms. Benjamin,
8  if you can get a copy of the report.
9          MS. BENJAMIN: I gave you the
10 Internal Affairs file.
11         MR. DAVENPORT: I am talking
12 about the preliminary notice.
13         MS. BENJAMIN: That was part of
14 the preliminary investigation, all part of the --
15     Q    Did you take any notes at all
16 concerning this walk-in?
17     A    Handwritten notes?
18     Q    If it was a walk-in.
19     A    I am sure I probably did, yes.
20     Q    Now, with regard to those notes,
21 the handwritten notes, would you keep those?
22     A    Only until my pad is full and
23 then I would just destroy the pad. I would start
24 a new one.
25     Q    You wouldn't have that anymore?

Page 12

1      A    No.
2      Q    If you can tell me, you recall
3  at a certain point in time, interviewing Kevin
4  Francis. Correct?
5      A    Yes.
6      Q    In fact, I was there, if you
7  recall?
8      A    Yes.
9      Q    When you interviewed Kevin
10 Francis, he provided certain information to you.
11 Correct?
12     A    Yes.
13     Q    What is it that he provided to
14 you besides his statement?
15     A    As far as physical evidence?
16     Q    Yes.
17     A    A black T-shirt.
18     Q    What was the purpose of that
19 T-shirt being provided to you?
20     A    He claimed he was urinated on by
21 the officers he encountered.
22     Q    Did you request that T-shirt?
23     A    How it came in my possession, I
24 don't remember. I remember taking possession of
25 it.

Page 13

1      Q    What was the purpose of taking
2  possession of it?
3      A    Lab testing.
4      Q    When you say lab testing, what
5  is it you were going to have tested?
6      A    To see if there was actually
7  urine on the shirt.
8      Q    Did you do that?
9      A    Yes.
10     Q    What did you do with the T-shirt
11 once you got it?
12     A    Sent to the State Police lab in
13 Hamilton, New Jersey.
14     Q    Prior to sending it to the state
15 lab, did you take any photographs of the T-shirt?
16     A    Yes.
17     Q    You have copies of those?
18     A    I am sure they are in the file.
19     Q    So you sent the T-shirt to the
20 state lab. Right?
21     A    Yes.
22     Q    And how is it that you sent the
23 T-shirt, how did you send it?
24     A    Hand-delivered to Sea Girt, New
25 Jersey.

Page 14

1   Q      It was hand-delivered to Sea
2   Girt?
3   A      Yes.
4   Q      Did you ever receive the T-shirt
5   back after you sent it?
6   A      Yes.
7   Q      And do you know where the
8   T-shirt is now?
9   A      No.
10   Q      When you received the T-shirt,
11   what did you do with it?
12   A      The best I can recall, I
13   notified your office that it was back and for you
14   to pick it up.
15   Q      And how did you do that?
16   A      By the card you had left me when
17   we first met.
18   Q      When you say to the best you
19   recall, are you saying you are sure you notified
20   me?
21   A      I am sure I did notify you. I
22   was under the assumption up until this notice
23   that you had the T-shirt back.
24   Q      Where would it have been left?
25   A      Where would --

Page 15

1   Q      When it came to the police
2   department, where did it go?
3   A      It was under my desk waiting for
4   you to get it.
5   Q      That's where you left it --
6   A      In my file cabinet.
7   Q      You didn't put it in the
8   evidence room?
9   A      It wasn't evidence, it was
10   private property.
11   Q      It wasn't evidence. And the --
12   strike that.
13          And when you say property, as
14   you refer to it, comes into your possession
15   during an Internal Affairs investigation, is that
16   what you normally do with it, stick it in your
17   desk or under your desk?
18   A      No, my best attempt is to return
19   it to the owner.
20   Q      Your best attempt is to return
21   it to the owner?
22   A      Yes.
23   Q      And if you cannot return it to
24   the owner, what do you do then?
25   A      Send it to the property room.

Page 16

1   Q      Did you ever send this T-shirt
2   to the property room?
3   A      I am assuming I did if you
4   didn't pick it up.
5   Q      Do you ever recall me coming to
6   pick it up?
7   A      I remember meeting you, I don't
8   know how many times. I honestly can't recall.
9   Q      Do you recall anyone coming to
10   pick the T-shirt up?
11   A      I assume that it was picked up.
12   Q      That's not my question, sir. My
13   question is do you recall anyone coming to pick
14   the T-shirt up specifically?
15   A      In detail, no.
16   Q      Now, when someone comes to pick
17   up evidence or property as you refer to it, that
18   was used during the course of an Internal Affairs
19   investigation, do you make them sign a receipt to
20   indicate that they received it?
21   A      Yes.
22   Q      Do you have a receipt indicating
23   that that T-shirt was ever picked up?
24   A      Not in my possession, no.
25   Q      Have you ever seen a receipt

Page 17

1   indicating that that T-shirt was ever picked up?
2   A      No.
3   Q      And it's fair to say that that
4   T-shirt was not in fact picked up?
5   A      Again, I was under the
6   assumption up until the notice of this day that
7   it was.
8   Q      If someone was coming to pick
9   the T-shirt up, where would they get it from?
10   A      It would have been from me.
11   Q      They would have to come and pick
12   it up from you?
13   A      Yes.
14   Q      And then you would have had them
15   sign a receipt?
16   A      Yes.
17   Q      And you don't dispute that the
18   T-shirt was in fact provided to you. Correct?
19   A      No, I do not dispute that.
20   Q      In fact, when the T-shirt was
21   provided to you, I was there. Correct?
22   A      Yes.
23   Q      My client was there. Correct?
24   A      Yes.
25   Q      His mother was there. Correct?

Page 18

1    A    Yes.
2    Q    And I had an investigator with
3  me that turned the T-shirt over to you.  Correct?
4    A    That part I don't recall,
5  another party.
6    Q    You don't have any recollection
7  to dispute that.  Correct?
8    A    About an independent
9  investigator?
10    Q    Yes.
11    A    If you say he was there, I have
12  no reason to doubt you.
13         (Whereupon, Exhibit P-1, Letter
14  dated April 11, 2008, is received and marked for
15  Identification by the reporter.)
16    Q    Lieutenant Marasco, I am going
17  to ask you to look at P-1 after your attorney
18  looks at it.  Do you ever recall receiving -- can
19  you identify what that document is, please.
20    A    One minute, please.
21    Q    Sure.
22    A    Okay.  The question again?
23    Q    Can you identify that letter?
24    A    A letter from your office to me.
25    Q    Do you recall receiving that

Page 19

1  letter?
2    A    Two years ago?  I don't remember
3  it.
4    Q    Okay.  Can you indicate what the
5  contents of that letter are?
6    A    Acknowledging correspondence
7  that was sent to you and a request to return
8  clothing that was provided for analysis.
9    Q    Okay.  Thank you.
10         Now, you did in fact receive a
11  report from the State Police lab concerning this
12  matter.  Correct?
13    A    Yes.
14    Q    And do you recall what that
15  report indicated?
16    A    Negative for urine.
17    Q    And you did not in fact after
18  that, or at least you did not stop your
19  investigation, with that report?
20    A    No, I did not.
21    Q    What else did you do?
22    A    Exactly, I don't know.  I don't
23  know what point in time it came back and where
24  exactly I was in the investigation, if it was at
25  the County Prosecutor's Office, I would have to

Page 20

1  look at the whole investigation and read through
2  it.
3    Q    An investigation of this type,
4  what would you normally do?
5         MS. BENJAMIN:  I am going to
6  object to the form, you can answer it.
7    A    It all depends on what stage of
8  the investigation you are at.  If it's in the
9  county, you do nothing.  You notify them what you
10  have, if you have anything.
11    Q    Well, was this investigation
12  sent to the county?
13    A    Yes.
14    Q    What happened with that?
15    A    I believe it was returned.
16    Q    It was returned as?
17    A    No criminal.
18    Q    Now, you ultimately did make
19  some findings here.  Correct?
20    A    Yes.
21    Q    What were your findings?
22    A    The best I recall, that I could
23  not prove or disprove the fact that your client
24  was urinated on or assaulted, however, the
25  officer involved did deviate from department

Page 21

1  orders with other actions that night and they
2  were charged accordingly for that.
3    Q    How did they deviate?
4    A    By not processing a juvenile
5  they came across in the proper manner with regard
6  to a curfew violation.
7    Q    What was supposed to be done?
8    A    They are taken to a juvenile
9  processing unit on Dickerson Street, they should
10  be processed up there.
11    Q    And to be processed, when you
12  say processed, what are you referring to?
13    A    It all depends if he's a
14  first-time offender, second or third, it's a
15  different process for each.
16    Q    Tell me what happens if it's a
17  first-time offender, if you know?
18    A    I would have to get the general
19  order to give you an accurate description,
20  normally they are logged in, warned and their
21  parents are notified to pick them up.
22    Q    You found there had been a
23  department violation by the officers involved?
24    A    Yes.
25    Q    What officers were those?

Page 22

```
 1       A      I believe one was Matos and I
 2  don't remember the other name offhand.
 3       Q      You do know there was in fact a
 4  violation that you found.  Correct?
 5       A      Yes.
 6       Q      Now, would the other person be
 7  Tavares?
 8       A      That sounds familiar, yes.
 9       Q      What -- when conducting an
10  internal affairs investigation, and you find
11  wrong doing, if your investigation leads to the
12  conclusion that other officers were wrong but
13  were not necessarily subjects of that
14  investigation, would you expand the investigation
15  to include the other officers?
16       A      Yes.
17       Q      Now, in this case, you had the
18  opportunity to speak with superior officers
19  involved in this case also.  Correct?
20       A      I don't remember exactly who I
21  talked to.  I would have to read the report.
22       Q      You don't remember exactly who
23  you talked to?
24       A      I am sure it was more than the
25  two who were involved.
```

Page 23

```
 1       Q      You know that you spoke with a
 2  Police Officer Daniel Gregoire, G-R-E-G-O-I-R-E?
 3       A      No.
 4       Q      What about a Lieutenant Adolph
 5  Vazquez?
 6       A      Did I speak with him?
 7       Q      Yes.
 8       A      If it's in the report, I did.  I
 9  don't remember the intimate details of the
10  investigation at this time.
11       Q      Okay.  I'd like to have this
12  page of the report marked.
13              (Whereupon, Exhibit P-2, Report
14  dated 1/3/08, is received and marked for
15  Identification by the reporter.)
16       Showing you what's been marked
17  P-2 for Identification.  Can you indicate what
18  that is?
19       A      It's my investigation, page
20  seven.
21       Q      It does indicate that you did
22  speak with -- let me see that, please, with
23  Lieutenant Adolph Vazquez.  Correct?
24       A      Yes.
25       Q      Okay.  Can you just take a look
```

Page 24

```
 1  at that report, please.
 2       A      Okay.
 3       Q      So if you could, could you just
 4  give a summary concerning what Adolph Vazquez
 5  told you?
 6       A      Can I read the report again?
 7  Remember being present at 150 New York Avenue
 8  looking for suspects who might have been involved
 9  in a burglary.  During the search he was advised
10  by unit 314 that a possible suspect and called
11  them over to Nicholas and Adams.  Once they
12  arrived, they described a thin black juvenile and
13  he told them to standby to speak with robbery who
14  was in route.  He then states he picked up and
15  left the location.
16       Q      So Lieutenant Vazquez, during
17  your investigation, did you find that he was the
18  superior officer involved in this investigation
19  at the time?
20       A      He was present there.
21       Q      Was he the most superior
22  officer?
23       A      Again, I would have to read it
24  front to back to make sure he was.
25       Q      So you don't recall?
```

Page 25

```
 1       A      Not offhand, no, I mean -- there
 2  could have been others.
 3       Q      Okay.  Now, you specifically
 4  asked this lieutenant whether or not he had any
 5  involvement in the disposition of the male
 6  juvenile.  Correct?
 7       A      Again, I would have to read it.
 8  If that's what it says in my report, that's what
 9  it says.
10       Q      I want to make sure I understand
11  what you are asking.  I am going to direct you
12  to, under the section synopsis of personnel
13  statement, third paragraph down, if you could
14  explain to me what that means.
15       A      I asked him --
16       Q      Let me interrupt you.  First let
17  me ask you to just read that sentence.
18       A      When asked if unit 314 ever
19  reached out for specific instructions and
20  guidance in reference to disposition of the male
21  juvenile, the lieutenant replied no, they did
22  not.
23       Q      Indicate to me what that
24  sentence is designed to mean.
25       A      I was looking to gather from the
```

Page 26

1  lieutenant if the officers just reached out to a
2  supervisor if they needed help, if they had a
3  question of what was the right thing to do at the
4  time.
5      Q      He indicated that they did not
6  ask?
7      A      They did not ask for any help.
8      Q      Now, during the course of your
9  investigation, did you have the opportunity to
10  review personnel files of the officers who were
11  involved?
12      A      Personnel files, no.
13      Q      Any type of files concerning
14  complaints that may have been lodged against the
15  officers in the past?
16      A      We review their disciplinary
17  abstract.
18      Q      You reviewed those here?
19      A      I am sure I did.
20          (Whereupon, Exhibit P-3, Report
21  dated January 3, 2008, is received and marked for
22  Identification by the reporter.)
23      Q      Okay.  I am showing you what's
24  been marked P-3 for Identification.  There is an
25  indication that you reviewed the disciplinary

Page 27

1  records involved in this matter.  Correct?
2      A      Yes.
3      Q      What did you find?
4      A      Found that Officer Tavares had
5  two prior investigations for excessive force, one
6  was closed out as not sustained and the other was
7  unfounded.  He had three investigations
8  concerning disobedience to orders and all were
9  sustained.  Officer Matos had no prior
10  investigations for excessive force, he had two
11  for disobedience to orders and both were
12  sustained.
13      Q      It does say you found that there
14  was an infraction committed here.  Correct?
15      A      Yes.
16      Q      What was the nature of the
17  infraction?
18      A      I believe it was disobedience to
19  orders.
20      Q      When you say disobedience to
21  orders, do you recall exactly what the orders
22  were that they disobeyed in this matter?
23      A      The general order pertaining to
24  the curfew violations.
25      Q      And the reason why you found

Page 28

1  them to be in violation here is because, I take
2  it, when general orders were put out, the orders
3  are expected to be followed --
4      A      They are obligated to follow
5  those orders.
6      Q      Now, when you make your
7  findings, after you make your findings, do you
8  have any further role in the matter or is your
9  case pretty much closed out and then it moves
10  onto another department or division for further
11  handling?
12      A      If it's sustained, it does move
13  onto another department, the advocate section,
14  and my involvement would be when it goes to
15  police trials, to testify as a witness against
16  the officers that are accused.
17      Q      Did that happen here?
18      A      Yes, but I don't believe I
19  testified.
20      Q      So you indicate that there was a
21  specific police trial?
22      A      Yes.
23      Q      In this police trial, who was
24  involved in it?
25      A      The officers that are accused.

Page 29

1      Q      So both officers would have had
2  trials in this matter?
3      A      If they were both charged, yes.
4      Q      Let me go back.  You say there
5  could be a police trial.  Right?  Or is it
6  automatically a police trial if there are
7  sustained findings here.
8      A      If it's a violation of a lower
9  nature, they would have a command conference
10  which would be the commanding officer would hear
11  the matter.  Most of our jobs, the Internal
12  Affairs, most go to police trials.
13      Q      Most go to police trials.  Is
14  there a mechanism in place where you don't
15  necessarily have a trial, where it can be
16  resolved by way of some type of agreement
17  concerning the disposition, that's what I am
18  trying to find out, do you automatically have to
19  have a trial or can a person say, okay, I am
20  wrong, I'd like to take some type of sanction,
21  punishment?
22      A      There are plea agreements at
23  police trials, yes.
24      Q      In this case there was not a
25  plea agreement?

Page 30

1      A      There might have been, I don't
2  know. I just don't remember testifying that day.
3      Q      So you don't have -- are you
4  testifying that you knew that trials were
5  scheduled in this matter?
6      A      I believe I was present that
7  day. I got a subpoena for it.
8      Q      When did that take place?
9      A      I have no idea. Probably within
10 months of my investigation, that's usually the
11 time frame.
12     Q      At these police trials, do the
13 officers normally testify?
14     A      Some do, some don't.
15     Q      There would certainly be
16 witnesses there?
17     A      Yes.
18     Q      Well, in this case, do you know
19 if the complainant would have been called?
20     A      I don't recall. That would be
21 up to the advocate section to subpoena witnesses
22 and provide discovery.
23     Q      And in these police trials as
24 you refer to them, is there a court reporter
25 present?

Page 31

1      A      It is done by tape recorder.
2      Q      There is a tape recorder?
3      A      Yes.
4          MR. DAVENPORT: Ms. Benjamin, do
5  you know if that took place here?
6          MS. BENJAMIN: I have no idea.
7          MR. DAVENPORT: I'd like you to
8  find out if there was a police trial and if I
9  could have the discovery on that. Thank you.
10     Q      But you specifically went to a
11 hearing but were not called concerning this
12 matter?
13     A      That's the best I can remember.
14 I remember being there, I don't remember
15 testifying.
16     Q      And the normal course of
17 business, when you had these police trials, that
18 you were involved as an investigating officer, do
19 you normally find out the disposition, what
20 happened?
21     A      If you want to inquire on your
22 own, but you are not officially notified.
23     Q      Now, your investigation did in
24 fact lead you to at least come to the conclusion
25 that at a certain point in time, on the date in

Page 32

1  question, that Officers Matos and Tavares did
2  have custody of Kevin Francis. Correct?
3      A      They did have custody of
4  somebody, I don't know if I totally pinpointed it
5  was your defendant. I don't know, I would have
6  to read it again.
7      Q      You found them to have been in
8  violation of the policy for the curfew violation?
9      A      They definitely had a juvenile
10 in their possession. I don't know if I
11 established if it was Kevin Francis or not. I
12 might have, I just would have to review the
13 report.
14          (Whereupon, Exhibit P-4, Lab
15 Report, two pages, is received and marked for
16 Identification by the reporter.)
17     Q      Lieutenant, I am showing you
18 what's been marked P-4 for Identification. Can
19 you indicate what that is?
20     A      New Jersey State Police Office
21 of Forensic Scientists, Laboratory Report.
22     Q      That's the report you received
23 back from the lab concerning the DNA analysis in
24 this case. Correct?
25     A      I don't know if they did a DNA

Page 33

1  analysis. To tell you the truth, I don't know
2  what test they did on it.
3      Q      It was a test to find out if
4  possible, whether or not, there was any urine on
5  the T-shirt. Correct?
6      A      Yes, that's what I requested of
7  them.
8      Q      In that report it indicates
9  there was no finding of urine in the T-shirt.
10 Correct?
11     A      Yes.
12     Q      And then there is a section down
13 towards the bottom of the report that says
14 something to the effect of the shirt was not
15 submitted for trace analysis, please contact the
16 lab for trace analysis if you so desire,
17 something to that effect. Correct?
18     A      Yes.
19     Q      Do you have an understanding of
20 what that means, the portion for trace analysis?
21     A      I think it was explained to me,
22 if there was -- if it was positive, there would
23 have been a further test for identification but I
24 don't recall 100 percent.
25     Q      So you don't know what that

Page 34

1   means?
2        A      I remember asking about it, but
3   at this point, I don't remember what the
4   explanation was.
5        Q      In fact what you just indicated
6   about if it was positive, there would be further
7   analysis, you are not sure if that refers to that
8   sentence that you just -- that I just summarized
9   for you at all.  Correct?
10       A      I'm not sure I understand what
11  you are saying.  What the lab scientists,
12  whatever they are referred to, was negative for
13  urine, had it been positive, then the trace test
14  would have been done.  That's the way I
15  understood it.  I took that as a negative for
16  urine.
17       Q      That's the way you understood
18  it, but you are not certain of it, as you sit
19  here today, what the second and third sentences
20  in that report are referring to?
21              MS. BENJAMIN:  I am going to
22  object to the form.  You can answer the question.
23       A      I thought I did.  This would
24  have been necessary if the first sentence would
25  have been positive.  It didn't.  It was explained

Page 35

1   to me I didn't have to worry about that.
2        Q      And you are sure about that?
3        A      As best I can recall.
4        Q      Who did you speak to?
5        A      Whoever I dealt with at the lab,
6   I'm not sure.
7        Q      Would it be the person that
8   signed the report, Courtney McDonald (ph).
9        A      Maybe, whoever I dealt with when
10  I dropped it off.
11       Q      Do you know whether or not the
12  state lab took pictures of the T-shirt that was
13  submitted to them for analysis?
14       A      I have no knowledge of their
15  procedures once they received it.
16       Q      Now, when you came in possession
17  of the T-shirt that was submitted for analysis in
18  this case, were you careful to identify the
19  T-shirt?
20              MS. BENJAMIN:  Objection to the
21  form.  You can answer it.
22       A      I don't understand your
23  question.
24       Q      I'll try to clarify it.  What I
25  am asking you is did you make any effort at all

Page 36

1   to clearly identify the T-shirt in terms of who
2   the designer was, you know how you may have a
3   name tag or care tag in the back of the T-shirt,
4   may say Fruit of the Loom or whoever, whoever the
5   manufacturer is, did you take any steps to
6   clearly identify the T-shirt?
7        A      Outside of a black T-shirt, I
8   don't know if that was entered onto the property
9   sheet.
10       Q      The T-shirt you took possession
11  of -- if may I have this marked, please.
12              (Whereupon, Exhibit P-5,
13  Property Form dated 7/24/07, is received and
14  marked for Identification by the reporter.)
15       Q      Can you identify that document,
16  please.
17       A      Newark Police Department
18  Property Form.
19       Q      On that form, that form
20  basically indicates what it is that you took
21  possession of concerning the T-shirt when it was
22  presented to you for your investigation.
23  Correct?
24       A      Yes.
25       Q      What does it indicate you took

Page 37

1   possession of?
2        A      Of an extra large black T-shirt.
3        Q      That's all it says.  Right?
4        A      Yes.
5        Q      It doesn't indicate who the
6   manufacturer was or who the designer was or
7   anything to that effect.  Correct?
8        A      It doesn't state that.
9        Q      It just says -- let me take a
10  look at it.  It just says extra large black
11  T-shirt.  Correct?
12       A      Yes.
13       Q      So it doesn't have any
14  indication whether it was Fruit of the Loom,
15  Hahnes, Calvin Klein, whatever?
16       A      On that report, it does not.
17       Q      Is that on any report?
18       A      I believe a property report was
19  done by Lieutenant Ballard (ph).  He might have
20  indicated more details.
21       Q      A property report by Lieutenant
22  Ballard?
23       A      Yes.
24       Q      Not sure if I asked this
25  question or not, but do you know whether or not

Page 38

1  the State Police lab would have taken a T-shirt
2  -- a picture -- excuse me, do you know whether or
3  not the State Police lab would have taken a
4  picture of the T-shirt that was presented to them
5  for analysis?
6      A      I don't know the procedures at
7  all.
8          (Whereupon, a recess is taken.)
9      Q      Now, Lieutenant, when you began
10 the investigation into this case, what
11 specifically were the nature of the allegations
12 that you were going to be investigating?
13     A      I believe it was classified as
14 an excessive force investigation.
15     Q      And what were your findings with
16 regard to excessive force in this matter.
17     A      I was unable to sustain the
18 allegations, not sustained was the official
19 close-out.
20     Q      In fact, you indicate in your
21 letter to Kevin Francis dated January 3, 2008
22 that although the evidence in this investigation
23 indicates the facts obtained cannot prove or
24 disprove your original case, your original
25 complaint, there is sufficient evidence to

Page 39

1  sustain a department violation that may or may
2  not be related.  Correct?
3      A      Yes.
4      Q      So basically you don't really
5  know or your investigation could not lead you to
6  a conclusion as to whether or not the excessive
7  force occurred.  Correct?
8      A      That's correct.
9      Q      So maybe it doesn't happen,
10 correct, excessive force?
11     A      I couldn't prove it either way.
12     Q      So if you could answer the
13 question, so maybe the excessive force did not
14 happen.  Correct?
15     A      Again, I could not prove through
16 my investigation either way.  I don't like to
17 deal in maybes.
18     Q      So it could have happened.
19 Correct?
20     A      Maybe.
21         (Whereupon, Exhibit P-6, January
22 3, 2008 letter to Kevin Francis, is received and
23 marked for Identification by the reporter.)
24     Q      Can you take a look at what we
25 marked P-6 for Identification.  I just want you

Page 40

1  to identify it, I don't have any further
2  questions on it.
3      A      It's what we call a disposition
4  letter.
5      Q      And it's dated?
6      A      January 3, 2008.
7      Q      That's a letter that we just
8  referred to, that you sent to my client, Mr.
9  Francis.  Correct?
10     A      Yes.
11     Q      Indicating that there was
12 sufficient evidence to sustain a department
13 violation.  Correct?
14     A      Yes.
15     Q      That's P-6 for the record.
16         (Whereupon, Exhibit P-7, Motor
17 Patrol Log, is received and marked for
18 Identification by the reporter.)
19     Q      Lieutenant, you have P-7 before
20 you.  Can you identify what that is?
21     A      A Newark Police Department Motor
22 Patrol Log.
23     Q      What unit is that Motor Patrol
24 Log for?
25     A      Unit 314.

Page 41

1      Q      Which officers would that cover?
2      A      Antonio Tavares and Anthony
3  Matos.
4      Q      Can you indicate to me
5  specifically what that document is and what the
6  purpose of that document is?
7      A      It's a chronological listing of
8  the unit's activities through their tour.
9      Q      And when you say the unit, you
10 are speaking of the vehicle they are in?
11     A      The unit, to be more specific,
12 the unit and the vehicle can be two different
13 numbers.
14     Q      What is 314?
15     A      The unit number.
16     Q      What is the unit?
17     A      Would be their regular call sign
18 in their geographical area which would be 314.
19 The vehicle was 317.
20     Q      Now, when you -- I take it you
21 reviewed P-7 during your investigation?
22     A      Yes.
23     Q      And what purpose did you review
24 P-7 for?
25     A      To see if any units were in the

Page 42

1   area where the complainant alleges the incident
2   happened.
3       Q       What did you find based on the
4   Motor Patrol Log?
5       A       I would have to check the report
6   to corollate what I found.
7       Q       You can't make it out by just
8   looking at the motor patrol log individually?
9       A       I don't know if the times, I do
10  recognize 150 New York Avenue, which was one
11  location that was used.  I don't know if the
12  times match up or if I made the correlation.  I
13  would have to see the report.
14      Q       Is there a specific section of
15  your report that you would look to?
16      A       Somewhere in there, I don't know
17  if it's -- it's been years.
18      Q       Well, with your attorney's
19  permission, I would like to have you take a look
20  at your report without the necessity of marking
21  the entire report.
22          MS. BENJAMIN:  That's fine.
23      Q       So if you can see if you find it
24  in your report.
25      A       It's mentioned on page six of my

Page 43

1   investigation.
2       Q       What do you find there?
3       A       A check of the third precinct
4   log sheet reveals no police action taken at any
5   of the locations the complainant provided.  The
6   log sheet reveals that Officer Matos worked with
7   Officer Tavares and the supervisor working was
8   Officer Vazquez.
9       Q       When you refer to the no police
10  action taken at the location, what are you
11  referring to in terms of location, what locations
12  were you looking for?
13      A       I believe what the complainant
14  was alleging, the actual contact with the police
15  was on Doremus Avenue and where he made initial
16  contact.
17      Q       When you say the location, are
18  you looking for the location where Mr. Francis
19  alleges that he was assaulted and urinated on, is
20  that what you are referring to?
21      A       Any location he would have gave
22  me, I would have tried to see if there was a unit
23  in that area.
24      Q       How is it that the information
25  that's on the motor patrol log is -- how is that

Page 44

1   information put onto the sheet?
2       A       By the observer.
3       Q       What observer would that be?
4       A       That would have been officer
5   number two, the observer would have been Anthony
6   Matos.
7       Q       It would have been put on the
8   patrol log by the officers.  Correct?
9       A       Yes.
10      Q       It would be very easy for the
11  officer just not to write this location down on
12  the patrol log.  Correct?
13          MS. BENJAMIN:  Object to the
14  form.  You can answer.
15      A       I couldn't answer on what they
16  do.
17      Q       It's easy for an officer, if he
18  goes somewhere, either by inadvertence or
19  purposefully, he doesn't write his location on
20  the patrol log?
21      A       Assume mistakes could be made.
22      Q       Or it could be done
23  purposefully.  Right?
24      A       I guess.
25          (Whereupon, Exhibit P-8, Tour

Page 45

1   Assignment Report, two pages, is received and
2   marked for Identification by the reporter.)
3       Q       Lieutenant, I am showing you
4   what's been marked P-8.  Can you identify what
5   that document is?
6       A       Tour assignment sheets for the
7   Third Precinct.  Shows who worked that night,
8   what cars they had and what areas they were
9   assigned.
10      Q       Is there reference to the
11  subjects of your investigation, Officer Matos
12  and/or Tavares in that report?
13      A       Yes.
14      Q       What does it indicate?
15      A       On the second page I see Tavares
16  as 314 and -- with Matos, yes, 314 using the 317
17  car.
18      Q       Pretty much it?
19      A       It gives the squads and other
20  information.
21          (Whereupon, Exhibit P-9, Event
22  Chronology, is received and marked for
23  Identification by the reporter.)
24      Q       I am showing you what's been
25  marked P-9 for Identification.  Can you indicate

Page 46

1  what that is?
2      A      It's an Event Chronology.
3      Q      What is the purpose of P-9?
4      A      This is generated by the radio
5  room, whatever information is inputted into the
6  computer by the operator, it's memorialized in a
7  report like this.
8      Q      Does it have something to do
9  with a specific event, all events, why is it
10 generated, for what purpose?
11     A      For a specific event.
12     Q      And that's the Event Chronology
13 that you reviewed in conjunction with your
14 investigation. Correct?
15     A      If it was in my report, yes.
16     Q      You can't say independently
17 whether or not that's the Event Chronology that
18 you reviewed?
19     A      Two and a half years later, you
20 hand me a piece of paper, I would have to look at
21 the original to be 100 percent sure.
22     Q      Your original what?
23     A      My investigation. You handed me
24 a piece of paper. It looks like I would have
25 reviewed this at the time but I don't know if

Page 47

1  it's the exact same one.
2      Q      I'll give you your report back.
3  You can take a look.
4      A      If you want me to answer
5  specifically stone yes, I would want my report in
6  my folder. I would assume this is correct if
7  this is what the city provided to you.
8      Q      Well, I want to make sure I was
9  provided the right document. Is there any
10 reference in your report that would indicate that
11 that's the Event Chronology?
12     A      I would have to read --
13     Q      I'll let you read it. I only
14 have a few more questions for you after this.
15     A      I don't see it specifically
16 mentioned in my investigation. It would have
17 been something I probably looked at to see if I
18 could put the officers at that location.
19     Q      But you don't know for sure
20 whether or not that's your Event Chronology.
21 Right?
22     A      If it's in my original
23 investigation, then I would assume it was mine,
24 that I looked at it.
25     Q      You have no reason to dispute

Page 48

1  that being the Event Chronology you reviewed in
2  connection with your investigation though.
3  Correct?
4      A      Correct.
5      Q      Now, as a former Internal
6  Affairs Investigator, you are pretty familiar
7  with departmental guidelines and regulations,
8  rules, things of that nature, how officers are to
9  conduct themselves in their investigations.
10 Correct?
11     A      In general or investigations? I
12 don't understand.
13     Q      I am talking about with respect
14 to the procedures that are to be employed by
15 officers, patrol units?
16     A      Yes.
17     Q      When conducting investigations,
18 you are familiar with how they are to conduct
19 themselves. Correct?
20     A      Yes.
21     Q      Let me ask you a question with
22 regard to what's supposed to happen with regard
23 to anyone coming into the custody of a
24 police officer. In this incident, it's alleged
25 that at a certain point in time, Kevin Francis

Page 49

1  was detained by the police officers, Officer
2  Matos and Tavares. You are aware that's his
3  allegation. Correct?
4      A      Yes.
5      Q      And you are also aware of the
6  fact that the complainant in your investigation
7  alleges that he was assaulted, physically
8  assaulted by the officers. Correct?
9      A      Yes.
10     Q      And that he was urinated on by
11 these officers. Correct?
12     A      That he claims he was, yes.
13     Q      He claims he was urinated on by
14 these officers. Correct?
15     A      Yes.
16     Q      So based on what you have
17 learned during the course of your investigation,
18 is there any reason that you could find that Mr.
19 Francis should have been assaulted by these
20 officers at all?
21            MS. BENJAMIN: Objection to the
22 form of the question. You can answer it.
23     Q      Based on your investigation,
24 should they have hit Mr. Francis?
25     A      No.

Page 50

1    Q    You are aware there are times
2  when officers may have to employ physical force.
3  Correct?
4    A    Yes.
5    Q    But in this case, you did not
6  find that situation to be present. Correct?
7    A    Correct.
8    Q    And you certainly -- there is
9  never a time when an officer should urinate on a
10  person. Correct?
11    A    Correct.
12    Q    You certainly didn't find that
13  appropriate conduct in this case?
14    A    Had that happened; I didn't find
15  any reason why it would have been appropriate.
16    Q    Now, when individuals are
17  detained by police officers and put in a patrol
18  unit, is there any departmental regulation that
19  says there should be some type of report filed?
20    A    It should be a field
21  interrogation.
22    Q    What is a field interrogation?
23    A    Documents the encounter.
24    Q    Were there any field
25  investigations prepared by Officer Matos or

Page 51

1  Tavares in this matter?
2    A    I don't believe there was any.
3    Q    That would be a requirement.
4  Right?
5    A    Yes.
6    Q    Well, at a certain point in time
7  during your investigation, didn't the officers
8  indicate to you, maybe this would help refresh
9  your recollection, didn't the officers indicate
10  to you that they did in fact detain Mr. Francis
11  and they did have him in their police unit?
12    A    You asked me before. I know
13  they had a juvenile, I just can't remember
14  specifically it was Kevin Francis. They had
15  somebody.
16    Q    Do you recall them -- so they
17  did admit to you they had someone. Correct?
18    A    Yes.
19    Q    Where did they tell you they had
20  him?
21    A    Geographically or --
22    Q    Physically, did they have him in
23  the car?
24    A    I believe they did have him in
25  the car.

Page 52

1    Q    Did they indicate they did drop
2  him off somewhere?
3    A    I believe it was Penn Station.
4    Q    They dropped him off at Penn
5  Station. Correct?
6    A    Yes.
7    Q    There was -- now, under those
8  circumstances, there should have been a field
9  interrogation report. Correct?
10    A    No, it would have been
11  different, he was a juvenile.
12    Q    Why?
13    A    Because he was a juvenile.
14    Q    Indicate to me what is the
15  difference.
16    A    There is two general orders, one
17  is specifically for adults, one for juveniles.
18  They should have followed the juveniles, he
19  should have been taken to Dickerson Street and
20  done that paperwork.
21    Q    If it's a juvenile, you don't
22  have to do a field investigation, there is no
23  need to complete a field interrogation report
24  concerning a juvenile?
25    A    If he's -- if he's violating the

Page 53

1  curfew, no, and he was.
2    Q    Does the curfew specifically
3  indicate that?
4    A    The curfew order?
5    Q    Yes.
6    A    It should.
7    Q    Lieutenant, if you could
8  indicate for the record if that is the -- if you
9  could indicate for the record if that's the
10  provision that the officers were found guilty of
11  violating?
12    A    It appears to be, yes.
13    Q    Or at least the investigation
14  sustained that violation?
15    A    Yes.
16    (Whereupon, Exhibit Memorandum
17  dated June 19, 2003, two pages, description, is
18  received and marked for Identification by the
19  reporter.)
20    Q    And that -- can you specifically
21  indicate what that document is for the record?
22    A    P-10.
23    Q    If you could indicate what it is
24  for the record?
25    A    It's a Director's Memorandum to

Page 54

1    all personnel, subject is curfew ordinances or
2    the curfew ordinance.
3         Q       That's the curfew ordinance that
4    informs the officers of what their duties are
5    with respect to curfew violations. Correct?
6         A       Not the actual ordinance, it's
7    the memorandum or the order on how we are
8    supposed to enforce it.
9         Q       Now, in that memorandum, does it
10   indicate that there is no obligation to fill out
11   an interrogation report?
12        A       I am going to have to read it,
13   can you give me a minute.
14        Q       Sure.
15        A       Looks like it says the only
16   documentation would be a written warning under
17   procedures.
18        Q       Say it again?
19        A       Under the procedures part, they
20   should be issued a written warning.
21        Q       And it's your understanding that
22   based on this memorandum, that there is no need
23   to complete a field interrogation report?
24        A       That would just be redundant in
25   information. Everything should be contained on

Page 55

1    the warning.
2         Q       Now, that is -- is that assuming
3    there is no allegations that the juvenile was
4    involved in any criminal activity?
5         A       Referring to the curfew
6    violation or the field interrogation?
7         Q       Field interrogation. The -- let
8    me strike that and start over.
9              In this instance, at some point
10   in time, there is an allegation -- strike that.
11             If there had been a violation
12   that the juvenile was out past the curfew hours
13   and were involved in a criminal activity, say if
14   he was questioned about whether or not he tried
15   to rob anyone or break-in any cars, and it was
16   past the curfew, would there be a necessity to do
17   a field interrogation also since he was
18   questioned as to whether or not he was involved
19   in any criminal activity?
20        A       If he were to do one, I don't
21   think they would have been wrong, but since they
22   were doing the curfew violation, that would have
23   been the correct way to go and that would
24   document where it happened, why it happened and
25   when it happened. That's what the field

Page 56

1    interrogation is for.
2         Q       That information would have been
3    contained in the report concerning the curfew
4    violation?
5         A       Yes.
6         Q       And so there should be a report
7    filled out if there is a curfew violation?
8         A       Yes.
9         Q       And what type of report would
10   that be?
11        A       A curfew violation report.
12        Q       There is a document that says
13   Curfew Violation Report?
14        A       Under the warning -- truthfully,
15   I don't know that procedure. I haven't been at
16   patrol for years and haven't dealt with juveniles
17   in longer.
18        Q       There should have been some
19   report to document that contact?
20        A       Yes.
21        Q       Whether it's a field
22   interrogation, and you say not necessarily in
23   this case, or whether it's a curfew violation
24   report of some type?
25        A       Yes.

Page 57

1              (Whereupon, Exhibit P-11, Letter
2    dated December 4, 2007, is received and marked
3    for Identification by the reporter.)
4         Q       Now, Lieutenant, I am going to
5    ask you to take a look at P-11 and indicate for
6    the record what that is?
7         A       It's a letter authored by myself
8    to the State Police Forensic Lab requesting the
9    results of the lab test.
10        Q       And I am going to -- what is the
11   date of that letter?
12        A       December 4, 2007.
13             (Whereupon, Exhibit P-12,
14   Evidence Receipt dated July 27, 2007, is received
15   and marked for Identification by the reporter.)
16        Q       If you could indicate what P-12
17   is for the record, also?
18        A       It's an Evidence Receipt from
19   the State of New Jersey Department of Law and
20   Public Safety Division of State Police East
21   Regional Laboratory in Sea Girt, New Jersey.
22        Q       What is that indicating, that
23   document.
24        A       A T-shirt.
25        Q       Excuse me?

Page 58

1    A    A T-shirt.
2    Q    It indicates that they received
3  it?
4    A    Uh-huh.
5    Q    Indicating that the police lab
6  received the T-shirt from you?
7    A    Yes.
8    Q    Okay. I'll take those.
9         Now, the persons who ultimately
10  became the subject of your investigation, officer
11  Antonio Tavares, did you know him prior to the
12  investigation?
13    A    There is a few Tavares, I don't
14  know if I knew him specifically.
15    Q    But when I say do you know him
16  -- well, you don't know if you knew him
17  specifically. Correct?
18    A    Correct.
19    Q    So it's fair to say you didn't
20  have any type of personal relationship with him?
21    A    Like a friendship relationship,
22  no.
23    Q    And as you say, there is a few
24  Tavares, so Antonio Tavares doesn't stick out in
25  your mind for any reason as knowing him other

Page 59

1  than being involved in this investigation as you
2  sit here today?
3    A    I have literally had hundreds of
4  subordinates working under me. I remember Jose
5  Tavares, so if he specifically could have worked
6  under me at one time in my career, so I probably
7  do know him by face, but not in a personal
8  relationship.
9    Q    Nothing that would have
10  interfered with the handling of this
11  investigation?
12    A    No.
13    Q    What about Anthony Matos, same
14  question, did you know him prior to being
15  involved in this investigation?
16    A    He did work for me when I was a
17  sergeant and he was a patrolman in the second
18  precinct.
19    Q    How long ago was that?
20    A    Early 2000, 2001 when I was
21  first promoted to sergeant.
22    Q    Do you recall how long he worked
23  for you?
24    A    No.
25    Q    What was your relationship like

Page 60

1  when he worked for you?
2    A    His supervisor.
3    Q    Did you guys ever go out at all?
4    A    No, not at all.
5    Q    Not at all? Not after work,
6  drinks, nothing like that?
7    A    I can't remember ever
8  socializing with any of my subordinates.
9    Q    He never came over your house,
10  you never went to his house?
11    A    Absolutely not.
12    Q    Only relationship you would have
13  had with Anthony Matos was he was a prior
14  subordinate of yours?
15    A    Yes.
16    Q    And did that relationship
17  interfere with your ability to conduct this
18  investigation fairly and impartially?
19    A    No.
20    Q    With regard to your obligations
21  as -- at the time as an Internal Affairs
22  investigator, are there any procedures in place
23  or rules in place which indicate that conflicts
24  of interest should be avoided when investigating
25  officers?

Page 61

1    A    Yes, you can request the TOT,
2  turnover to someone else if it's a personal
3  friend of yours.
4    Q    If it's a personal friend. Are
5  there any written orders or directives which
6  indicate under certain circumstances, an officer
7  should not be involved in an investigation due to
8  conflicts? Are there any written procedures in
9  place?
10    A    I believe it's in the Attorney
11  General Guidelines in references to policies and
12  procedures, usually our general order mimics the
13  guidelines but it's definitely in the guidelines.
14    Q    Under those guidelines, is there
15  any provision which indicates that an
16  investigating Internal Affairs Officer should not
17  be involved in an investigation that concerns one
18  of his former subordinates?
19    A    Not that I am aware of.
20    Q    But you are not certain whether
21  or not that exists?
22    A    I don't think it exists, I don't
23  see why it would exist.
24    Q    I have one other area I wanted
25  to cover with you. You indicated there may have

Page 62

1  been a property report by Lieutenant Ballard
2  concerning maybe an identification of the
3  T-shirt?
4       A       There should have been if he
5  included it.
6       Q       Would that be in your report?
7       A       The fact that he did it was. I
8  don't know if the actual report was in there.
9       Q       Excuse me?
10      A       I don't think the actual report
11  was in my investigation, the fact he did it, I
12  believe I mentioned in the investigation.
13      Q       So there was a report?
14      A       Yeah, I believe I remember
15  reading about that.
16      Q       When did you read that?
17      A       I reviewed it last night
18  quickly.
19              MR. DAVENPORT: Alright, no
20  further questions.
21              MS. BENJAMIN: I have a few.
22
23  CROSS EXAMINATION BY MS. BENJAMIN:
24
25      Q       Lieutenant, you were asked

Page 63

1  several questions about the T-shirt in this case.
2  Sitting here today, do you have an independent
3  recollection of what happened to the T-shirt?
4       A       No.
5       Q       Do you recall personally
6  throwing away the T-shirt that was involved in
7  this case?
8       A       I would not have thrown it away.
9       Q       And under normal guidelines,
10  when you do these types of investigations, when
11  you retain property, what is the normal procedure
12  of what is done to that property once your
13  investigation is closed?
14      A       If it can't be returned to the
15  owner, if it doesn't pick it up, then it goes to
16  the property room.
17              MS. BENJAMIN: Thank you. I
18  don't have anything else.
19
20  REDIRECT EXAMINATION BY MR. DAVENPORT:
21
22      Q       You did say you checked the
23  property room?
24      A       Yes.
25      Q       And the T-shirt was not there?

Page 64

1       A       It's not logged in there.
2       Q       When did you check the property
3  room looking for the T-shirt?
4       A       I called personally yesterday.
5       Q       Did you check it at any time
6  before yesterday?
7       A       No, not personally.
8       Q       The first time you ever looked
9  for the T-shirt was yesterday?
10      A       In reference to the initial
11  investigation or in reference to the deposition
12  or me being mentioned as a defendant?
13      Q       Let me go back and ask you a few
14  more questions about the T-shirt. At a certain
15  point in time you came into possession of the
16  T-shirt?
17      A       Correct, yes.
18      Q       That's when it was turned over
19  to you while my client was there as with me, his
20  mother and my investigator?
21      A       Correct, yes.
22      Q       Shortly or sometime after that,
23  you sent that T-shirt to the State Police lab for
24  purposes of conducting an analysis to see whether
25  or not urine was on the T-shirt. Correct?

Page 65

1       A       Yes.
2       Q       You subsequently received that
3  T-shirt back. Correct?
4       A       Yes.
5       Q       After you received that T-shirt
6  back, when is the first time you became aware
7  that the T-shirt was needed for purposes of
8  litigation?
9       A       I think the law department
10  called me, it wasn't that long ago, asking me if
11  I knew about it.
12      Q       Approximately how long ago?
13      A       A month maybe.
14      Q       Was it this year?
15      A       I think it was.
16      Q       So you indicate a month maybe?
17      A       Probably after you filed, maybe
18  that's -- I don't know.
19      Q       You don't know. Right?
20      A       No.
21      Q       But when the law department
22  called you looking for the T-shirt, what did you
23  do?
24      A       I told them pretty much the same
25  I told you, I thought I gave it back to you but I

Page 66

1  thought it went to the property room.
2      Q      When they called you looking for
3  the T-shirt, did you actually look for it?
4      A      No.
5      Q      You never looked for it?
6      A      I was at home.
7      Q      So you were home?
8      MS. BENJAMIN:  For the record,
9  Lieutenant Marasco is out on disability and has
10  been on disability since January.
11      Q      So you have been out since
12  January?
13      A      Yes.
14      Q      You are still out?
15      A      Yes.
16      Q      So you are just here for
17  purposes of this deposition today?
18      A      Correct.
19      Q      And that's why you looked for
20  the T-shirt yesterday?
21      A      I called the property room to
22  make sure it wasn't there because I knew I would
23  be questioned about it.
24      Q      But you did get a call some time
25  prior to yesterday from the law department, even

Page 67

1  though you were out on disability inquiring as to
2  the status of the T-shirt?
3      A      Yes.
4      Q      What was your response?
5      A      Again, I thought I returned it
6  back to you.  If I didn't, it should be in the
7  property room.
8      Q      And you don't recall when that
9  conversation took place?
10      A      A month or two ago.
11      Q      Do you know who called you?
12      A      I think it was Detective
13  Montello (ph).
14      Q      And when he called you --
15      MS. BENJAMIN:  She.
16      Q      When she called you, did you
17  make any other efforts whatsoever to locate the
18  T-shirt?
19      A      No.
20      Q      Did you call anyone in Internal
21  Affairs and ask you to look in your desk or
22  anything like that?
23      A      No.
24      Q      When did you leave Internal
25  Affairs?

Page 68

1      A      September of '09.
2      Q      September of '09 when you left
3  Internal Affairs, did you clean your desk out?
4      A      That desk was clean -- we moved
5  from 22 Franklin Street to 16th Avenue.  There
6  was a move in between.
7      Q      Where is it now?
8      A      247 16th Avenue.
9      Q      Were you there when that move
10  took place?
11      A      Yes.
12      Q      You cleaned your desk out?
13      A      Yes.
14      Q      And did you come across the
15  T-shirt then?
16      A      No.
17      Q      You said the T-shirt could have
18  been under your desk also?
19      A      In my file cabinet, it's a
20  locked cabinet.
21      Q      Did you clean out the file
22  cabinet?
23      A      Oh, yeah.
24      Q      Was the T-shirt there?
25      A      No.

Page 69

1      Q      You don't recall when the last
2  time is you seen this T-shirt?
3      A      No.
4      Q      But you did receive it back from
5  the police lab?
6      A      Yes, I did.
7      MR. DAVENPORT:  No further
8  questions.
9      MS. BENJAMIN:  I don't have
10  anything else.
11      THE REPORTER:  Did anyone want a
12  copy of the transcript?
13      MR. DAVENPORT:  Yes.
14      MS. BENJAMIN:  No.
15      MS. BAGLEY:  No.
16      (Whereupon, the deposition is
17  concluded.)
18
19
20
21
22
23
24
25

Page  70

1
2                    CERTIFICATE OF OFFICER
3
4        I CERTIFY that the foregoing is a true and accurate
5   transcript of the testimony and proceedings as reported
6   stenographically by me at the time, place and on the
7   date as hereinbefore set forth.
8        I DO FURTHER CERTIFY that I am neither a relative nor
9   employee nor attorney nor counsel of any of the parties
10  to this action, and that I am neither a relative nor
11  employee of such attorney or counsel, and that I am not
12  financially interested in the action.
13
14
15
16
17          _____
            STEPHANIE LYN RAHN
18          Notary Public of the
            State of New Jersey
19
            My Commission Expires
20          February 8, 2012
21
22
23
24
25

| A |
|---|
| **ability** |
| 60:17 |
| **above-entitled** |
| 1:19 |
| **above-named** |
| 1:18 |
| **Absolutely** |
| 60:11 |
| **abstract** |
| 26:17 |
| **academy** |
| 6:11,17 7:19 |
| **accurate** |
| 21:19 70:4 |
| **accused** |
| 28:16,25 |
| **Acknowledging** |
| 19:6 |
| **action** |
| 1:2 43:4,10 70:10,12 |
| **actions** |
| 21:1 |
| **activities** |
| 41:8 |
| **activity** |
| 55:4,13,19 |
| **actual** |
| 43:14 54:6 62:8,10 |
| **ad** |
| 1:4 |
| **Adams** |
| 24:11 |
| **administrative** |
| 7:13 |
| **admit** |
| 51:17 |
| **Adolph** |
| 1:10 23:4,23 24:4 |
| **adults** |
| 52:17 |
| **advised** |
| 24:9 |
| **advocate** |
| 28:13 30:21 |
| **affairs** |
| 6:25 8:2,4,7,11,19,24 |
| 9:2,10,12,24 11:10 |

15:15 16:18 22:10
29:12 48:6 60:21
61:16 67:21,25 68:3
**ago**
19:2 59:19 65:10,12
67:10
**agreement**
29:16,25
**agreements**
29:22
**allegation**
49:3 55:10
**allegations**
38:11,18 55:3
**alleged**
48:24
**alleges**
42:1 43:19 49:7
**alleging**
43:14
**allow**
5:9
**Alright**
5:25 6:2 62:19
**analysis**
19:8 32:23 33:1,15,16
33:20 34:7 35:13,17
38:5 64:24
**and/or**
45:12
**answer**
5:10,21,22,24 20:6
34:22 35:21 39:12
44:14,15 47:4 49:22
**answers**
5:11
**Anthony**
1:9 2:10 41:2 44:5
59:13 60:13
**Antonio**
1:8 41:2 58:11,24
**anymore**
11:25
**appears**
53:12
**appropriate**
50:13,15
**Approximately**

65:12
**April**
3:12 18:14
**area**
4:23 41:18 42:1 43:23
61:24
**areas**
45:8
**arrived**
24:12
**asked**
25:4,15,18 37:24 51:12
62:25
**asking**
25:11 34:2 35:25 65:10
**assaulted**
20:24 43:19 49:7,8,19
**assigned**
6:18 8:15 10:8,12 45:9
**assignment**
3:20 10:9 45:1,6
**assume**
6:11 16:11 44:21 47:6
47:23
**assuming**
16:3 55:2
**assumption**
14:22 17:6
**attempt**
15:18,20
**attention**
10:1
**attorney**
2:7,10,13 18:17 61:10
70:9,11
**attorney's**
42:18
**August**
1:21
**authored**
57:7
**automatically**
29:6,18
**Avenue**
2:9 24:7 42:10 43:15
68:5,8
**AVION**
2:6

**avoided**
60:24
**aware**
49:2,5 50:1 61:19 65:6
**awhile**
8:4

| B |
|---|
| **B** |
| 3:10 |
| **back** |
| 8:18 9:13,14,15,21 |
| 14:5,13,23 19:23 |
| 24:24 29:4 32:23 36:3 |
| 47:2 64:13 65:3,6,25 |
| 67:6 69:4 |
| **background** |
| 6:7 |
| **BAGLEY** |
| 2:10 69:15 |
| **Ballard** |
| 37:19,22 62:1 |
| **based** |
| 42:3 49:16,23 54:22 |
| **basically** |
| 4:24 6:11 36:20 39:4 |
| **began** |
| 38:9 |
| **believe** |
| 8:15 9:6 20:15 22:1 |
| 27:18 28:18 30:6 |
| 37:18 38:13 43:13 |
| 51:2,24 52:3 61:10 |
| 62:12,14 |
| **Benjamin** |
| 2:6 3:7 5:23 11:7,9,13 |
| 20:5 31:4,6 34:21 |
| 35:20 42:22 44:13 |
| 49:21 62:21,23 63:17 |
| 66:8 67:15 69:9,14 |
| **best** |
| 10:19,23 14:12,18 |
| 15:18,20 20:22 31:13 |
| 35:3 |
| **black** |
| 12:17 24:12 36:7 37:2 |
| 37:10 |
| **bottom** |

33:13
**break-in**
55:15
**brief**
4:16
**Broad**
1:20 2:5
**BROOKE**
2:10
**Bureau**
7:3,5
**burglary**
24:9
**business**
4:4 31:17

---

**C**

**C**
2:3 4:3
**cabinet**
15:6 68:19,20,22
**call**
40:3 41:17 66:24 67:20
**called**
1:18 24:10 30:19 31:11
  64:4 65:10,22 66:2,21
  67:11,14,16
**Calvin**
37:15
**capacity**
1:9,10,11,12,13,15
**car**
45:17 51:23,25
**card**
14:16
**care**
36:3
**career**
59:6
**careful**
35:18
**cars**
45:8 55:15
**case**
4:19,22 6:2 22:17,19
  28:9 29:24 30:18
  32:24 35:18 38:10,24
  50:5,13 56:23 63:1,7

**Center**
2:12
**certain**
10:2 12:3,10 31:25
  34:18 48:25 51:6 61:6
  61:20 64:14
**certainly**
30:15 50:8,12
**CERTIFICATE**
70:2
**Certified**
1:19
**CERTIFY**
70:4,8
**charged**
21:2 29:3
**check**
42:5 43:3 64:2,5
**checked**
63:22
**Chief**
7:14
**chronological**
41:7
**Chronology**
3:21 45:22 46:2,12,17
  47:11,20 48:1
**circumstances**
52:8 61:6
**city**
1:8,20 2:4,7 8:16 47:7
**CIVIL**
1:2
**claimed**
12:20
**claims**
49:12,13
**clarify**
35:24
**classified**
38:13
**clean**
68:3,4,21
**cleaned**
68:12
**clearly**
36:1,6
**client**

17:23 20:23 40:8 64:19
**closed**
27:6 28:9 63:13
**closely**
10:1
**close-out**
38:19
**clothing**
19:8
**come**
17:11 31:24 68:14
**comes**
15:14 16:16
**coming**
16:5,9,13 17:8 48:23
**command**
29:9
**commanding**
29:10
**commencing**
1:21
**Commission**
70:19
**committed**
27:14
**complainant**
10:22 11:3 30:19 42:1
  43:5,13 49:6
**complaint**
38:25
**complaints**
26:14
**complete**
52:23 54:23
**computer**
46:6
**concerning**
6:3,8 10:3 11:4,16
  19:11 24:4 26:13 27:8
  29:17 31:11 32:23
  36:21 52:24 56:3 62:2
**concerns**
61:17
**concluded**
69:17
**conclusion**
22:12 31:24 39:6
**conduct**

48:9,18 50:13 60:17
**conducting**
22:9 48:17 64:24
**conference**
29:9
**conflicts**
60:23 61:8
**conjunction**
46:13
**connection**
48:2
**contact**
33:15 43:14,16 56:19
**contained**
54:25 56:3
**contents**
19:5
**conversation**
67:9
**copies**
13:17
**copy**
11:8 69:12
**corollate**
42:6
**correct**
6:4 7:22 10:4 12:4,11
  17:18,21,23,25 18:3,7
  19:12 20:19 22:4,19
  23:23 25:6 27:1,14
  32:2,24 33:5,10,17
  34:9 36:23 37:7,11
  39:2,7,8,10,14,19
  40:9,13 44:8,12 46:14
  47:6 48:3,4,10,19
  49:3,8,11,14 50:3,6,7
  50:10,11 51:17 52:5,9
  54:5 55:23 58:17,18
  64:17,21,25 65:3
  66:18
**correlation**
42:12
**correspondence**
19:6
**counsel**
5:19,20,20 70:9,11
**county**
19:25 20:9,12

**course**
5:8 6:12 16:18 26:8
  31:16 49:17
**court**
1:1,24 5:13 30:24
**Courtney**
35:8
**cover**
41:1 61:25
**criminal**
6:25 7:3,4 20:17 55:4
  55:13,19
**CROSS**
3:3 62:23
**curfew**
21:6 27:24 32:8 53:1,2
  53:4 54:1,2,3,5 55:5
  55:12,16,22 56:3,7,11
  56:13,23
**custody**
32:2,3 48:23

---

**D**

**D**
3:1 4:3
**Daniel**
23:2
**Darrin**
1:6,11 2:7 3:4
**date**
31:25 57:11 70:7
**dated**
3:12,13,14,16,18,22,23
  3:24 18:14 23:14
  26:21 36:13 38:21
  40:5 53:17 57:2,14
**Davenport**
2:11 3:6 4:8,14 11:11
  31:4,7 62:19 63:20
  69:7,13
**day**
17:6 30:2,7
**deal**
39:17
**dealt**
35:5,9 56:16
**December**
3:23 57:2,12

**defendant**
2:10 4:19 32:5 64:12
**Defendants**
1:16 2:7
**definitely**
32:9 61:13
**department**
2:5 6:16 7:7 15:2 20:25
  21:23 28:10,13 36:17
  39:1 40:12,21 57:19
  65:9,21 66:25
**departmental**
48:7 50:18
**department-wide**
7:7
**depends**
20:7 21:13
**DepoLink**
1:23
**deposition**
1:4,18,19 4:18 64:11
  66:17 69:16
**described**
24:12
**description**
3:11 21:19 53:17
**designed**
5:5 25:24
**designer**
36:2 37:6
**desire**
33:16
**desk**
15:3,17,17 67:21 68:3
  68:4,12,18
**destroy**
11:23
**detail**
16:15
**details**
23:9 37:20
**detain**
51:10
**detained**
49:1 50:17
**Detective**
67:12
**detectives**

7:8,11,14
**deviate**
20:25 21:3
**Dickerson**
21:9 52:19
**difference**
52:15
**different**
21:15 41:12 52:11
**direct**
3:3 4:8 9:25 25:11
**directed**
5:24
**directives**
61:5
**Director's**
53:25
**disability**
66:9,10 67:1
**disciplinary**
26:16,25
**discovery**
30:22 31:9
**disobedience**
27:8,11,18,20
**disobeyed**
27:22
**disposition**
25:5,20 29:17 31:19
  40:3
**disprove**
20:23 38:24
**dispute**
17:17,19 18:7 47:25
**DISTRICT**
1:1,2
**division**
7:1 28:10 57:20
**DNA**
32:23,25
**document**
18:19 36:15 41:5,6
  45:5 47:9 53:21 55:24
  56:12,19 57:23
**documentation**
54:16
**Documents**
50:23

**doing**
4:4 11:1 22:11 55:22
**Doremus**
43:15
**doubt**
18:12
**drinks**
60:6
**drop**
52:1
**dropped**
35:10 52:4
**due**
61:7
**duly**
4:5
**duties**
6:19 54:4

---

**E**

**E**
2:3,3 3:1,10 4:3,3
**Early**
59:20
**East**
57:20
**easy**
44:10,17
**effect**
5:7 33:14,17 37:7
**effectively**
5:15
**effort**
35:25
**efforts**
67:17
**either**
39:11,16 44:18
**employ**
50:2
**employed**
7:24 48:14
**employee**
70:9,11
**employment**
6:12
**encounter**
50:23

encountered
12:21
ended
8:18
enforce
54:8
enforcement
6:8
entered
36:8
entire
8:1,12 42:21
ESQ
2:6,10,11
established
32:11
event
3:21 45:21 46:2,9,11
46:12,17 47:11,20
48:1
events
46:9
everybody
7:1
evidence
3:24 12:15 15:8,9,11
16:17 38:22,25 40:12
57:14,18
exact
47:1
exactly
19:22,24 22:20,22
27:21
Examination
1:5,18 4:8 62:23 63:20
excessive
27:5,10 38:14,16 39:6
39:10,13
excuse
38:2 57:25 62:9
executive
10:10
Exhibit
18:13 23:13 26:20
32:14 36:12 39:21
40:16 44:25 45:21
53:16 57:1,13
exist

61:23
exists
61:21,22
expand
22:14
expectations
5:2
expected
28:3
Expires
70:19
explain
25:14
explained
33:21 34:25
explanation
34:4
extra
37:2,10

___

**F**

face
59:7
fact
12:6 17:4,18,20 19:10
19:17 20:23 22:3
31:24 34:5 38:20 49:6
51:10 62:7,11
facts
38:23
fair
17:3 58:19
fairly
60:18
familiar
9:9 22:8 48:6,18
far
6:23 12:15
FAVA
2:8
Fax
1:24
February
6:17 70:20
field
50:20,22,24 52:8,22,23
54:23 55:6,7,17,25
56:21

Fifth
8:16
file
11:4,10 13:18 15:6
68:19,21
filed
11:6 50:19 65:17
files
26:10,12,13
fill
54:10
filled
56:7
financially
70:12
find
4:21 5:7 22:10 24:17
27:3 29:18 31:8,19
33:3 42:3,23 43:2
49:18 50:6,12,14
finding
33:9
findings
20:19,21 28:7,7 29:7
38:15
fine
42:22
first
6:10,21 14:17 25:16
34:24 59:21 64:8 65:6
first-time
21:14,17
folder
47:6
follow
28:4
followed
28:3 52:18
follows
4:6
fool
5:6
force
6:13 8:17 27:5,10
38:14,16 39:7,10,13
50:2
foregoing
70:4

forenoon
1:21
Forensic
32:21 57:8
form
3:16 20:6 34:22 35:21
36:13,18,19,19 44:14
49:22
former
48:5 61:18
forth
70:7
found
21:22 22:4 27:4,13,25
32:7 42:6 53:10
frame
30:11
Francis
1:4,5 4:15 6:3 10:4,18
12:4,10 32:2,11 38:21
39:22 40:9 43:18
48:25 49:19,24 51:10
51:14
Frankin
4:4
Franklin
68:5
friend
61:3,4
friendship
58:21
front
24:24
Fruit
36:4 37:14
FSH
1:2
full
5:9 11:22
function
9:23
functions
7:6
further
28:8,10 33:23 34:6
40:1 62:20 69:7 70:8

___

**G**

gather
25:25
general
21:18 27:23 28:2 48:11
52:16 61:11,12
generated
46:4,10
geographical
41:18
Geographically
51:21
Girt
13:24 14:2 57:21
give
21:19 24:4 47:2 54:13
gives
45:19
giving
4:16 6:9
go
8:24 15:2 29:4,12,13
55:23 60:3 64:13
goes
28:14 44:18 63:15
going
11:7 13:5 18:16 20:5
25:11 34:21 38:12
54:12 57:4,10
Good
4:10,13
graduate
7:18
graduated
6:17
Gregoire
23:2
guardian
1:4
guess
7:16 44:24
guidance
25:20
guidelines
48:7 61:11,13,13,14
63:9
guilty
53:10
guys

60:3
G-R-E-G-O-I-R-E
23:2
_____
H
H
3:10
Hahnes
37:15
half
46:19
HALL
1:20 2:4
Hamilton
13:13
hand
46:20
handed
46:23
handling
28:11 59:10
handwritten
11:17,21
hand-delivered
13:24 14:1
happen
28:17 39:9,14 48:22
happened
4:25 5:8 8:10 20:14
31:20 39:18 42:2
50:14 55:24,24,25
63:3
happens
21:16
Headquarters
7:14
hear
29:10
hearing
31:11
help
26:2,7 51:8
hereinbefore
70:7
higher
9:16
hit
49:24

home
66:6,7
honestly
16:8
hours
55:12
house
60:9,10
hundreds
59:3
_____
I
idea
30:9 31:6
identification
18:15 23:15,17 26:22
26:24 32:16,18 33:23
36:14 39:23,25 40:18
45:2,23,25 53:18 57:3
57:15 62:2
identify
18:19,23 35:18 36:1,6
36:15 40:1,20 45:4
impartially
60:18
inadvertence
44:18
incident
10:1,17 42:1 48:24
include
22:15
included
62:5
independent
18:8 63:2
independently
46:16
indicate
10:6 16:20 19:4 23:17
23:21 25:23 28:20
32:19 36:25 37:5
38:20 41:4 45:14,25
47:10 51:8,9 52:1,14
53:3,8,9,21,23 54:10
57:5,16 60:23 61:6
65:16
indicated
7:15 9:1 19:15 26:5

34:5 37:20 61:25
indicates
33:8 36:20 38:23 58:2
61:15
indicating
16:22 17:1 40:11 57:22
58:5
indication
6:10 26:25 37:14
individually
1:8,9,10,11,13,14 42:8
individuals
50:16
information
6:7 10:17 12:10 43:24
44:1 45:20 46:5 54:25
56:2
informs
54:4
infraction
27:14,17
initial
10:16 43:15 64:10
inputted
46:5
inquire
31:21
inquiring
67:1
instance
55:9
instruct
5:20
instructions
4:16 25:19
interest
60:24
interested
70:12
interfere
60:17
interfered
59:10
internal
6:25 8:2,4,7,11,19,23
9:2,10,11,24 11:10
15:15 16:18 22:10
29:11 48:5 60:21

61:16 67:20,24 68:3
**interrogation**
50:21,22 52:9,23 54:11
54:23 55:6,7,17 56:1
56:22
**interrupt**
25:16
**interviewed**
12:9
**interviewing**
12:3
**intimate**
23:9
**investigating**
31:18 38:12 60:24
61:16
**investigation**
6:3,25 10:3,14 11:1,2
11:14 15:15 16:19
19:19,24 20:1,3,8,11
22:10,11,14,14 23:10
23:19 24:17,18 26:9
30:10 31:23 36:22
38:10,14,22 39:5,16
41:21 43:1 45:11
46:14,23 47:16,23
48:2 49:6,17,23 51:7
52:22 53:13 58:10,12
59:1,11,15 60:18 61:7
61:17 62:11,12 63:13
64:11
**investigations**
7:3,5 27:5,7,10 48:9,11
48:17 50:25 63:10
**investigative**
7:6
**investigator**
8:25 9:13,15,17,18,19
9:19,22,24 18:2,9
48:6 60:22 64:20
**involve**
7:4
**involved**
10:3,7,18 20:25 21:23
22:19,25 24:8,18
26:11 27:1 28:24
31:18 55:4,13,18 59:1
59:15 61:7,17 63:6

**involvement**
25:5 28:14
**issued**
54:20

___ J ___

**January**
3:13,14,18 26:21 38:21
39:21 40:6 66:10,12
**Jersey**
1:2,20,21 2:6,9 4:4
13:13,25 32:20 57:19
57:21 70:18
**jobs**
29:11
**JOHN**
1:12
**Jose**
59:4
**July**
3:17,24 6:18 57:14
**June**
3:22 53:17
**juvenile**
21:4,8 24:12 25:6,21
32:9 51:13 52:11,13
52:21,24 55:3,12
**juveniles**
52:17,18 56:16

___ K ___

**keep**
11:21
**Kevin**
1:4 4:15 6:3 10:4,18
12:3,9 32:2,11 38:21
39:22 48:25 51:14
**Klein**
37:15
**knew**
30:4 58:14,16 65:11
66:22
**know**
4:17,18,21 5:13 6:2
10:11,16 14:7 16:8
19:22,23 21:17 22:3
23:1 30:2,18 31:5
32:4,5,10,25 33:1,25

35:11 36:2,8 37:25
38:2,6 39:5 42:9,11
42:16 46:25 47:19
51:12 56:15 58:11,14
58:15,16 59:7,14 62:8
65:18,19 67:11
**knowing**
58:25
**knowledge**
35:14

___ L ___

**L**
4:3
**lab**
3:15 13:3,4,12,15,20
19:11 32:14,23 33:16
34:11 35:5,12 38:1,3
57:8,9 58:5 64:23
69:5
**Laboratory**
32:21 57:21
**Lackawanna**
2:9
**large**
37:2,10
**law**
2:5 6:8 57:19 65:9,21
66:25
**lead**
31:24 39:5
**leads**
22:11
**learned**
49:17
**leave**
67:24
**left**
8:12,14 14:16,24 15:5
24:15 68:2
**letter**
3:12,18,23 18:13,23,24
19:1,5 38:21 39:22
40:4,7 57:1,7,11
**License**
1:20
**lieutenant**
4:12,13 6:23 7:9 8:14

9:19,22,23 18:16 23:4
23:23 24:16 25:4,21
26:1 32:17 37:19,21
38:9 40:19 45:3 53:7
57:4 62:1,25 66:9
**likewise**
5:11
**listing**
41:7
**litem**
1:4
**literally**
59:3
**litigation**
1:24 65:8
**LLC**
2:8
**locate**
67:17
**location**
24:15 42:11 43:10,11
43:17,18,21 44:11,19
47:18
**locations**
43:5,11
**locked**
68:20
**lodged**
26:14
**log**
3:19 40:17,22,24 42:4
42:8 43:4,6,25 44:8
44:12,20
**logged**
21:20 64:1
**long**
6:13 59:19,22 65:10,12
**longer**
56:17
**look**
18:17 20:1 23:25 37:10
39:24 42:15,19 46:20
47:3 57:5 66:3 67:21
**looked**
47:17,24 64:8 66:5,19
**looking**
24:8 25:25 42:8 43:12
43:18 64:3 65:22 66:2

looks
18:18 46:24 54:15
Loom
36:4 37:14
lower
29:8
Lt
1:6 2:7 3:4
LYN
1:19 70:17

**M**

M
4:3
male
25:5,20
manner
21:5
manufacturer
36:5 37:6
Marasco
1:6,11 2:7 3:4 18:16
66:9
marked
18:14 23:12,14,16
26:21,24 32:15,18
36:11,14 39:23,25
40:17 45:2,4,22,25
53:18 57:2,15
marking
42:20
match
42:12
Matos
1:9 2:10 22:1 27:9 32:1
41:3 43:6 44:6 45:11
45:16 49:2 50:25
59:13 60:13
matter
1:19 4:15 10:7 11:5
19:12 27:1,22 28:8
29:2,11 30:5 31:12
38:16 51:1
maybes
39:17
McDonald
35:8
mean

25:1,24
means
25:14 33:20 34:1
mechanism
29:14
meeting
16:7
memorandum
3:22 53:16,25 54:7,9
54:22
memorialized
46:6
mentioned
42:25 47:16 62:12
64:12
merely
5:7
met
14:17
method
6:24
mimics
61:12
mind
58:25
mine
47:23
minute
18:20 54:13
mistakes
44:21
Montello
67:13
month
65:13,16 67:10
months
30:10
morning
4:10,13
mother
17:25 64:20
motor
3:19 40:16,21,23 42:4
42:8 43:25
motorcycle
6:24 8:2
move
28:12 68:6,9

moved
68:4
moves
28:9

**N**

N
2:3 3:1 4:3,3,3
name
22:2 36:3
named
4:19
nature
6:14 27:16 29:9 38:11
48:8
necessarily
22:13 29:15 56:22
necessary
34:24
necessity
42:20 55:16
need
52:23 54:22
needed
26:2 65:7
negative
19:16 34:12,15
neither
70:8,10
never
50:9 60:9,10 66:5
new
1:2,20,21 2:6,9 4:4
11:24 13:13,24 24:7
32:20 42:10 57:19,21
70:18
Newark
1:8,21 2:6,7,13 4:4
6:16 36:17 40:21
Nicholas
24:11
night
21:1 45:7 62:17
NJ
2:13
normal
31:16 63:9,11
normally

15:16 20:4 21:20 30:13
31:19
Notary
1:20 4:5 70:18
notes
11:15,17,20,21
notice
11:12 14:22 17:6
notified
14:13,19 21:21 31:22
notify
14:21 20:9
number
3:11 41:15 44:5
numbers
41:13

**O**

O
4:3
object
5:22 20:6 34:22 44:13
Objection
35:20 49:21
objections
5:19
obligated
28:4
obligation
54:10
obligations
60:20
observer
44:2,3,5
obtained
38:23
occurred
39:7
offender
21:14,17
offhand
22:2 25:1
office
14:13 18:24 19:25
32:20
officer
2:10 6:9 7:18 10:10
20:25 23:2 24:18,22

27:4,9 29:10 31:18
43:6,7,8 44:4,11,17
45:11 48:24 49:1 50:9
50:25 58:10 61:6,16
70:2
**officers**
12:21 21:23,25 22:12
22:15,18 26:1,10,15
28:16,25 29:1 30:13
32:1 41:1 44:8 47:18
48:8,15 49:1,8,11,14
49:20 50:2,17 51:7,9
53:10 54:4 60:25
**official**
1:9,10,11,12,13,15
38:18
**officially**
31:22
**Oh**
68:23
**okay**
5:16 9:4 18:22 19:4,9
23:11,25 24:2 25:3
26:23 29:19 58:8
**once**
7:18 13:11 24:11 35:15
63:12
**operator**
46:6
**opportunity**
22:18 26:9
**Oral**
1:5,18
**order**
21:19 27:23 53:4 54:7
61:12
**orders**
21:1 27:8,11,19,21,21
28:2,2,5 52:16 61:5
**ordinance**
54:2,3,6
**ordinances**
54:1
**original**
38:24,24 46:21,22
47:22
**Outside**
36:7

**owner**
15:19,21,24 63:15

---

**P**
**P**
2:3,3,11
**pad**
11:22,23
**page**
3:11 23:12,19 42:25
45:15
**pages**
3:15 32:15 45:1 53:17
**paper**
46:20,24
**paperwork**
52:20
**paragraph**
25:13
**parents**
21:21
**Park**
2:12
**part**
11:13,14 18:4 54:19
**parties**
70:9
**party**
18:5
**Paterson**
2:9
**patrol**
3:19 6:19,24 7:16,25
8:16 40:17,22,23 42:4
42:8 43:25 44:8,12,20
48:15 50:17 56:16
**patrolman**
7:17 59:17
**Penn**
52:3,4
**percent**
10:25 33:24 46:21
**permission**
42:19
**person**
22:6 29:19 35:7 50:10
**personal**
58:20 59:7 61:2,4

**personally**
63:5 64:4,7
**personnel**
25:12 26:10,12 54:1
**persons**
58:9
**pertaining**
27:23
**ph**
35:8 37:19 67:13
**Phone**
1:24
**photographs**
13:15
**physical**
12:15 50:2
**physically**
49:7 51:22
**pick**
14:14 16:4,6,10,13,16
17:8,11 21:21 63:15
**picked**
16:11,23 17:1,4 24:14
**picture**
38:2,4
**pictures**
35:12
**piece**
46:20,24
**pinpointed**
32:4
**place**
2:12 8:21 29:14 30:8
31:5 60:22,23 61:9
67:9 68:10 70:6
**plaintiff**
4:14
**Plaintiffs**
1:6 2:13
**plea**
29:22,25
**please**
18:19,20 23:22 24:1
33:15 36:11,16
**point**
10:2 12:3 19:23 31:25
34:3 48:25 51:6 55:9
64:15

**police**
6:10,16,17 7:7,18
13:12 15:1 19:11 23:2
28:15,21,23 29:5,6,12
29:13,23 30:12,23
31:8,17 32:20 36:17
38:1,3 40:21 43:4,9
43:14 48:24 49:1
50:17 51:11 57:8,20
58:5 64:23 69:5
**policies**
61:11
**policy**
32:8
**portion**
33:20
**posed**
5:19
**position**
8:24
**positive**
33:22 34:6,13,25
**possession**
12:23,24 13:2 15:14
16:24 32:10 35:16
36:10,21 37:1 64:15
**possible**
24:10 33:4
**precinct**
8:16 43:3 45:7 59:18
**preliminary**
10:13 11:1,2,12,14
**prepared**
50:25
**present**
24:7,20 30:6,25 50:6
**presented**
36:22 38:4
**presume**
4:18
**pretty**
7:1 28:9 45:18 48:6
65:24
**primary**
4:23
**prior**
9:2 13:14 27:5,9 58:11
59:14 60:13 66:25

private
15:10
probably
11:19 30:9 47:17 59:6
65:17
procedure
56:15 63:11
procedures
35:15 38:6 48:14 54:17
54:19 60:22 61:8,12
proceed
5:12
proceedings
4:20 5:9 70:5
process
21:15
processed
21:10,11,12
processing
21:4,9
promoted
8:14 59:21
promotion
6:21,22
proper
21:5
property
3:16 15:10,13,25 16:2
16:17 36:8,13,18
37:18,21 62:1 63:11
63:12,16,23 64:2 66:1
66:21 67:7
Prosecutor's
19:25
prove
20:23 38:23 39:11,15
provide
30:22
provided
12:10,13,19 17:18,21
19:8 43:5 47:7,9
provision
53:10 61:15
Public
1:20 57:20 70:18
punishment
29:21
purpose

4:20 12:18 13:1 41:6
41:23 46:3,10
purposefully
44:19,23
purposes
64:24 65:7 66:17
put
15:7 28:2 44:1,7 47:18
50:17
P-1
3:12 18:13,17
P-10
3:22 53:22
P-11
3:23 57:1,5
P-12
3:24 57:13,16
P-2
3:13 23:13,17
P-3
3:14 26:20,24
P-4
3:15 32:14,18
P-5
3:16 36:12
P-6
3:18 39:21,25 40:15
P-7
3:19 40:16,19 41:21,24
P-8
3:20 44:25 45:4
P-9
3:21 45:21,25 46:3

--- Q ---

question
5:9,10,12,22,25 16:12
16:13 18:22 26:3 32:1
34:22 35:23 37:25
39:13 48:21 49:22
59:14
questioned
55:14,18 66:23
questions
4:21,23 5:3,21 40:2
47:14 62:20 63:1
64:14 69:8
quickly

62:18

--- R ---

R
2:3 4:3,3,3
radio
46:4
RAHN
1:19 70:17
Randy
2:11 4:14
rank
4:11 6:22,23 7:20 9:16
reached
25:19 26:1
read
20:1 22:21 24:6,23
25:7,17 32:6 47:12,13
54:12 62:16
reading
62:15
really
39:4
reason
18:12 27:25 47:25
49:18 50:15 58:25
recall
10:19,23 12:2,7 14:12
14:19 16:5,8,9,13
18:4,18,25 19:14
20:22 24:25 27:21
30:20 33:24 35:3
51:16 59:22 63:5 67:8
69:1
receipt
3:24 16:19,22,25 17:15
57:14,18
receive
14:4 19:10 69:4
received
14:10 16:20 18:14
23:14 26:21 32:15,22
35:15 36:13 39:22
40:17 45:1,22 53:18
57:2,14 58:2,6 65:2,5
receiving
18:18,25
recess

38:8
recognize
42:10
recollection
18:6 51:9 63:3
record
5:23 40:15 53:8,9,21
53:24 57:6,17 66:8
recorder
31:1,2
records
27:1
RECROSS
3:3
REDIRECT
3:3 63:20
redundant
54:24
refer
15:14 16:17 30:24 43:9
reference
25:20 45:10 47:10
64:10,11
references
61:11
referred
10:20 34:12 40:8
referring
21:12 34:20 43:11,20
55:5
refers
34:7
refresh
51:8
regard
5:1,2 11:20 21:5 38:16
48:22,22 60:20
Regional
57:21
regular
41:17
regulation
50:18
regulations
48:7
related
39:2
relationship

58:20,21 59:8,25
60:12,16
**relative**
70:8,10
**remember**
11:1 12:24,24 16:7
19:2 22:2,20,22 23:9
24:7 30:2 31:13,14,14
34:2,3 51:13 59:4
60:7 62:14
**replied**
25:21
**report**
3:13,14,15,20 11:6,8
19:11,15,19 22:21
23:8,12,13 24:1,6
25:8 26:20 32:13,15
32:21,22 33:8,13
34:20 35:8 37:16,17
37:18,21 42:5,13,15
42:20,21,24 45:1,12
46:7,15 47:2,5,10
50:19 52:9,23 54:11
54:23 56:3,6,9,11,13
56:19,24 62:1,6,8,10
62:13
**reported**
70:5
**reporter**
1:20 5:13 18:15 23:15
26:22 30:24 32:16
36:14 39:23 40:18
45:2,23 53:19 57:3,15
69:11
**Reporting**
1:24
**represent**
4:14
**request**
12:22 19:7 61:1
**requested**
33:6
**requesting**
57:8
**requirement**
51:3
**resolved**
29:16

**respect**
48:13 54:5
**response**
67:4
**results**
57:9
**retain**
63:11
**return**
15:18,20,23 19:7
**returned**
20:15,16 63:14 67:5
**reveals**
43:4,6
**review**
26:10,16 32:12 41:23
**reviewed**
26:18,25 41:21 46:13
46:18,25 48:1 62:17
**RICCI**
2:8
**right**
13:20 26:3 29:5 37:3
44:23 47:9,21 51:4
65:19
**rob**
55:15
**robbery**
24:13
**Robert**
1:13 2:12
**role**
5:1 28:8
**room**
2:5 15:8,25 16:2 46:5
63:16,23 64:3 66:1,21
67:7
**route**
24:14
**rules**
48:8 60:23

— — — — — S — — — —
**S**
2:3 3:10 4:3
**Safe**
8:16
**Safety**

57:20
**sanction**
29:20
**saying**
14:19 34:11
**says**
25:8,9 33:13 37:3,9,10
50:19 54:15 56:12
**scheduled**
30:5
**scientists**
32:21 34:11
**Sea**
13:24 14:1 57:21
**search**
24:9
**second**
6:22 21:14 34:19 45:15
59:17
**section**
25:12 28:13 30:21
33:12 42:14
**see**
13:6 23:22 41:25 42:13
42:23 43:22 45:15
47:15,17 61:23 64:24
**seen**
16:25 69:2
**send**
13:23 15:25 16:1
**sending**
13:14
**sent**
9:14,15 13:12,19,22
14:5 19:7 20:12 40:8
64:23
**sentence**
25:17,24 34:8,24
**sentences**
34:19
**September**
68:1,2
**sergeant**
6:22 7:21,23 8:3,6 9:2
9:11,16,19 59:17,21
**service**
6:15,24
**Services**

1:24
**set**
9:10 70:7
**seven**
23:20
**sheet**
36:9 43:4,6 44:1
**sheets**
45:6
**shirt**
13:7 33:14
**Shorthand**
1:19
**Shortly**
64:22
**showing**
23:16 26:23 32:17 45:3
45:24
**Shows**
45:7
**sign**
16:19 17:15 41:17
**signed**
35:8
**sir**
16:12
**sit**
34:18 59:2
**Sitting**
63:2
**situation**
50:6
**six**
42:25
**socializing**
60:8
**somebody**
32:4 51:15
**sounds**
22:8
**speak**
22:18 23:6,22 24:13
35:4
**speaking**
5:15 41:10
**specific**
25:19 28:21 41:11
42:14 46:9,11

specifically
16:14 25:3 31:10 38:11
41:5 47:5,15 51:14
52:17 53:2,20 58:14
58:17 59:5
spoke
23:1
squads
45:19
stage
20:7
standby
24:13
start
4:15 11:23 55:8
started
6:16,21 7:16
state
1:20 13:12,14,20 19:11
32:20 35:12 37:8 38:1
38:3 57:8,19,20 64:23
70:18
statement
12:14 25:13
states
1:1 24:14
Station
52:3,5
status
67:2
stay
8:11
stenographically
70:6
STEPHANIE
1:19 70:17
steps
36:5
stick
15:16 58:24
stone
47:5
stop
19:18
Street
1:21 2:5 4:4 21:9 52:19
68:5
strike

15:12 55:8,10
subject
54:1 58:10
subjects
22:13 45:11
submitted
33:15 35:13,17
subordinate
60:14
subordinates
59:4 60:8 61:18
subpoena
30:7,21
subsequently
65:2
sufficient
38:25 40:12
Suite
2:9,12
summarized
34:8
summary
24:4
superior
22:18 24:18,21
supervise
7:11
supervisor
26:2 43:7 60:2
Support
1:24
supposed
21:7 48:22 54:8
sure
10:24 11:19 13:18
14:19,21 18:21 22:24
24:24 25:10 26:19
34:7,10 35:2,6 37:24
46:21 47:8,19 54:14
66:22
suspect
24:10
suspects
24:8
sustain
38:17 39:1 40:12
sustained
27:6,9,12 28:12 29:7

38:18 53:14
sworn
4:5
synopsis
25:12

_____

**T**

**T**
3:10 4:3,3
tag
36:3,3
take
5:14 8:21 11:15 13:15
23:25 28:1 29:20 30:8
36:5 37:9 39:24 41:20
42:19 47:3 57:5 58:8
taken
1:19 4:18 21:8 38:1,3,8
43:4,10 52:19
talked
22:21,23
talking
11:11 48:13
TAMIKA
1:5
tape
31:1,2
Task
8:16
Tavares
1:8 22:7 27:4 32:1 41:2
43:7 45:12,15 49:2
51:1 58:11,13,24,24
59:5
tell
9:10 12:2 21:16 33:1
51:19
tenure
6:8
terms
36:1 43:11
test
33:2,3,23 34:13 57:9
tested
13:5
testified
4:5 28:19
testify

28:15 30:13
testifying
30:2,4 31:15
testimony
70:5
testing
13:3,4
Thank
19:9 31:9 63:17
thin
24:12
thing
26:3
things
6:14 48:8
think
8:8,22 9:8 33:21 55:21
61:22 62:10 65:9,15
67:12
third
21:14 25:13 34:19 43:3
45:7
thought
34:23 65:25 66:1 67:5
three
27:7
throwing
63:6
thrown
63:8
time
5:16 6:13 7:16 8:1,9,12
10:2 12:3 19:23 23:10
24:19 26:4 30:11
31:25 46:25 48:25
50:9 51:6 55:10 59:6
60:21 64:5,8,15 65:6
66:24 69:2 70:6
times
16:8 42:9,12 50:1
today
34:19 59:2 63:2 66:17
today's
4:20
told
24:5,13 65:24,25
TOT
61:1

**totally**
32:4
**tour**
3:20 8:13 41:8 44:25
45:6
**trace**
33:15,16,20 34:13
**transcript**
1:18 69:12 70:5
**Treat**
2:12
**trial**
28:21,23 29:5,6,15,19
31:8
**trials**
28:15 29:2,12,13,23
30:4,12,23 31:17
**trick**
5:6
**tried**
43:22 55:14
**true**
70:4
**truth**
33:1
**truthfully**
56:14
**try**
5:11 35:24
**trying**
5:7 29:18
**turned**
18:3 64:18
**turnover**
61:2
**two**
3:15 19:2 22:25 27:5
27:10 32:15 41:12
44:5 45:1 46:19 52:16
53:17 67:10
**type**
20:3 26:13 29:16,20
50:19 56:9,24 58:20
**types**
63:10
**T-shirt**
4:24,25 5:1,3 12:17,19
12:22 13:10,15,19,23

14:4,8,10,23 16:1,10
16:14,23 17:1,4,9,18
17:20 18:3 33:5,9
35:12,17,19 36:1,3,6
36:7,10,21 37:2,11
38:1,4 57:24 58:1,6
62:3 63:1,3,6,25 64:3
64:9,14,16,23,25 65:3
65:5,7,22 66:3,20
67:2,18 68:15,17,24
69:2

**U**

**U**
4:3
**Uh-huh**
58:4
**ultimately**
8:18 20:18 58:9
**unable**
38:17
**understand**
25:10 34:10 35:22
48:12
**understanding**
33:19 54:21
**understood**
34:15,17
**unfounded**
27:7
**unit**
7:24 21:9 24:10 25:18
40:23,25 41:9,11,12
41:15,16 43:22 50:18
51:11
**UNITED**
1:1
**units**
41:25 48:15
**unit's**
41:8
**urinate**
50:9
**urinated**
12:20 20:24 43:19
49:10,13
**urine**
13:7 19:16 33:4,9

34:13,16 64:25
**usually**
11:2 30:10 61:12

**V**

**v**
1:7
**various**
6:18
**Vazquez**
1:10 23:5,23 24:4,16
43:8
**vehicle**
41:10,12,19
**verbally**
10:15
**violating**
52:25 53:11
**violation**
21:6,23 22:4 28:1 29:8
32:8,8 39:1 40:13
53:14 55:6,11,22 56:4
56:7,11,13,23
**violations**
27:24 54:5

**W**

**waiting**
15:3
**walk-in**
10:20,21 11:16,18
**want**
6:7 9:25 25:10 31:21
39:25 47:4,5,8 69:11
**wanted**
61:24
**warned**
21:20
**warning**
54:16,20 55:1 56:14
**wasn't**
15:9,11 65:10 66:22
**way**
29:16 34:14,17 39:11
39:16 55:23
**Wednesday**
1:21
**went**

6:10 8:23 9:13,21
31:10 60:10 66:1
**West**
2:9
**whatsoever**
67:17
**witness**
1:18 3:3 28:15
**witnesses**
30:16,21
**work**
7:14 59:16 60:5
**worked**
43:6 45:7 59:5,22 60:1
**working**
43:7 59:4
**worry**
35:1
**wouldn't**
11:25
**write**
44:11,19
**written**
54:16,20 61:5,8
**wrong**
22:11,12 29:20 55:21
**www.depolinklegal.c...**
1:25

**X**

**X**
3:1,10
**XIO1717**
1:20

**Y**

**yeah**
62:14 68:23
**year**
6:15,18,20 8:9,11,13
9:12 65:14
**years**
19:2 42:17 46:19 56:16
**yesterday**
64:4,6,9 66:20,25
**York**
24:7 42:10

```
        0               3:22 53:17          1:24
02                      2004                36
9:7                     8:8,14 9:12         3:17
04                      2005                39
9:6,8                   6:23 8:15           3:18
05                      2006
9:6                     8:22,23,24 9:12,21        4
07102                   2007                4
1:21 2:6,13             3:17,23,24 57:2,12,14   3:6,23 57:2,12
07424                   2008                40
2:9                     3:12,13,14,18 18:14  3:19
09                        26:21 38:21 39:22  44
68:1,2                    40:6               3:20
09-3449                 2010                45
1:2                     1:21                3:21
                        2012
        1               70:20                      5
1                       22                  5
1:12,14                 4:4 68:5            2:9
1/3/08                  23                  50
23:14                   3:13                2:12
10                      24                  53
1:12,14                 3:17,24             3:22
10:00                   247                 56
1:21                    68:8                3:23
100                     26                  57
10:25 33:24 46:21       3:14                3:24
11                      27
1:21 3:12 18:14         57:14                      6
150                                         62
24:7 42:10                      3           3:7
16th                    3                   63
6:15 68:5,8             3:13,14,18 26:21 38:21  3:6
18                        39:22 40:6
3:12                    300                        7
19                      2:9                 7/24/07
3:22 53:17              314                 36:13
1995                    24:10 25:18 40:25
6:17,21 7:15              41:14,18 45:16,16        8
                        316                 8
        2               2:5                 70:20
2000                    317                 825
6:22 7:21 9:4,7 59:20   41:19 45:16         2:12
2001                    32
59:20                   3:15                       9
2002                    353-9445            920
8:8,12                  1:24                1:20 2:5
2003                    353-9880            973
                                            1:24,24
```

1                              LAWYER'S NOTES

2       PAGE   LINE

3       ——     ——     ————————————————————————————————

4       ——     ——     ————————————————————————————————

5       ——     ——     ————————————————————————————————

6       ——     ——     ————————————————————————————————

7       ——     ——     ————————————————————————————————

8       ——     ——     ————————————————————————————————

9       ——     ——     ————————————————————————————————

10      ——     ——     ————————————————————————————————

11      ——     ——     ————————————————————————————————

12      ——     ——     ————————————————————————————————

13      ——     ——     ————————————————————————————————

14      ——     ——     ————————————————————————————————

15      ——     ——     ————————————————————————————————

16      ——     ——     ————————————————————————————————

17      ——     ——     ————————————————————————————————

18      ——     ——     ————————————————————————————————

19      ——     ——     ————————————————————————————————

20      ——     ——     ————————————————————————————————

21      ——     ——     ————————————————————————————————

22      ——     ——     ————————————————————————————————

23      ——     ——     ————————————————————————————————

24      ——     ——     ————————————————————————————————

25      ——     ——     ————————————————————————————————